David H. SCHOENBAUM, Plaintiff-Appellant,

v.

Bradshaw D. FIRSTBROOK et al., Defendants,

and

Harold W. Manley, Louis Pradal, John C. Rudolph, Donald K. Russell, Aquitaine Company of Canada, Ltd. and Paribas Corporation of New York, Defendants-Appellees.

No. 160, Docket 31408.

United States Court of Appeals Second Circuit.

Argued Nov. 8, 1967.

Decided May 29, 1968.

**204**

Sidney B. Silverman, New York City, for plaintiff-appellant.

Whitney North Seymour, Jr., New York City (Simpson, Thacher & Bartlett and John C. Diller, New York City, on the brief), for defendants Harold W. Manley, John C. Rudolph and Donald K. Russell.

Michael M. Maney, New York City (Sullivan & Cromwell and Marvin Schwartz, New York City, on the brief), for defendants Aquitaine Co. of Canada, Ltd. and Louis Pradal.

David Hartfield, Jr., New York City (White & Case, Thomas A. Butler and Paul J. Bschorr, New York City, on the brief), for defendant Paribas Corporation.

Before LUMBARD, Chief Judge, and MEDINA and HAYS, Circuit Judges.

LUMBARD, Chief Judge:

Plaintiff, an American shareholder of Banff Oil Ltd., a Canadian corporation, brought this shareholder derivative action to recover under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b) and Rule 10b–5, 17 CFR § 240.10b–5 (1967), for damages to the corporation resulting from the sales, in Canada, of Banff treasury stock to defendants Aquitaine of Canada, Ltd., and Paribas Corporation. Plaintiff alleged that the defendant corporations and Banff's directors, who are the individual defendants in this action, conspired to defraud Banff by making Banff sell treasury shares at the market price which the defendants, who had inside information not yet disclosed to the public, knew did not represent the true value of the shares.

Defendants moved pursuant to Rules 12(c) and 56, Fed.R.Civ.P., for summary judgment, and under Rule 12(b) to dismiss the complaint on the ground that the Court lacked jurisdiction over the subject matter. Judge Cooper, refusing to permit plaintiff to carry out a program of discovery, entered judgment for defendants, holding that the Court lacked jurisdiction because the Securities and Exchange Act does not have extraterritorial application, and that plaintiff failed to state a cause of action under § 10(b) and Rule 10b–5. 268 F.Supp. 385 (SDNY 1967).

We find that the district court had subject matter jurisdiction but affirm the judgment below because, while plaintiff's complaint alleges a breach of fiduciary duty by Banff's directors in authorizing sales of treasury shares at too low a price, these allegations fail to state a cause of action under § 10(b) of the Exchange Act.

*The Facts*

Banff is a Canadian corporation and conducts all of its operations within Canada. Its common stock is registered with the SEC and traded upon both the American Stock Exchange and the Toronto Stock Exchange. In February 1964, Aquitaine Company of Canada, Ltd., acquired control of Banff through a tender offer to Banff shareholders in the United States and Canada. Aquitaine is a wholly owned subsidiary of a French corporation, Societe National des Petroles d'Aquitaine, which in turn is a subsidiary of Enterprises for Research and Activities in Petroleum (ERAP), a French governmental oil agency.

In March 1964, Banff and Aquitaine entered into an agreement to conduct joint oil explorations. In October 1964, Banff entered into a "farmout agreement" with Socony Mobil under which Banff and Aquitaine would receive a 50% interest in 160,000 acres in the Rainbow Lake area of Alberta, Canada, in return for paying the total cost of drilling two exploratory wells. The Rainbow area is a desolate wilderness region over 100 miles from the nearest all-weather road or railway. At least sixteen wells had previously been drilled in the general vicinity by six different oil companies, and all had been abandoned as failures. Because of the difficulty of conducting explorations in this region and the highly speculative prospects for success Socony Mobil was willing to give up a half interest merely for drilling two test wells.

Banff received a 5% interest and Aquitaine received a 45% interest, pursuant to their joint exploration agreement, with the drilling costs to be paid 10% by Banff and 90% by Aquitaine. On December 11, 1964 Banff's Board of Directors, the three Aquitaine representatives abstaining, voted to offer to sell 500,000 shares of Banff treasury stock to Aquitaine at the current market price allegedly for the purpose of financing Banff's share of the exploration expenses. On January 5, 1965, Aquitaine's president wrote to Banff that "our Chairman and Managing Director * * * has agreed to your * * * proposal." On January 26, Banff issued a press release announcing that Aquitaine "intended to purchase" 500,000 shares of common stock at the price of $1.35 per share, the closing price on the Toronto Stock Exchange on December 11, 1964. Actual delivery of the shares took place March 16, 1965.

Exploration in the Rainbow area commenced toward the end of 1964. On February 6, 1965, the test well flowed oil to the surface on a drillstem test. This information was released to the public on February 8. The well reached total depth on March 17, 1965, the day after delivery on the Aquitaine purchase. On March 18, Banff issued a press release indicating that the discovery well was completed and that no further information would be disclosed in the immediate future. A further release on April 20 explained that the company was taking advantage of the Alberta law permitting it to withold information on its discovery for one year to reduce competition from other companies in bidding on government oil lands in the discovery area. The release stated "The Board feels that this discovery is of great significance to the company but it is too early to have any idea of the areal extent."

After the discovery, further exploration activity was undertaken. In September 1965, a press release announced the formation of a company, in which Banff has a 3⅓% interest and Aquitaine has a 30% interest, to build a pipeline into the area. To finance its activities, Banff's Board of Directors authorized negotiation of sales of treasury shares of common stock at $6.75 per share or more. Paribas Corporation—a Delaware corporation doing business in New York and a wholly owned subsidiary of Banque de Paris et des Pays-Bas, a French banking institution—negotiated a purchase of 270,000 shares of Banff Common at $7.30 per share, the current price on the Toronto Stock Exchange, on behalf of Banque de Paris et des Pays-Bas pour le Grand Duche de Luxembourg, another subsidiary of Banque de Paris. The issue was to be placed with "ten European professional investors." A verbal offer was made by Paribas on November 19, 1965. A written offer was mailed by Paribas from New York and was accepted by Banff in Canada on November 22. Payment and delivery took place in Canada January 24, 1966.

### The Allegations in the Complaint

The complaint alleged that "For some time prior to February 6, 1965, Aquitaine and the other defendants knew Banff had exceptionally valuable oil properties located in the Rainbow Lake area in Alberta, Canada." It alleged that the Aquitaine purchase of 500,000 treasury shares at $1.35 per share took place March 15, 1965, and that the Paribas purchase of 270,000 shares at $7.30 on January 24, 1966 was on behalf of "affiliates, business associates and friends" of Aquitaine and its parent companies, and that defendants withheld information until March 16, 1966 in order to purchase the treasury shares at an artificially low market price, paying to Banff about $10,000,000 less than the stock's fair market value.[1]

The individual defendants are all of Banff's directors. They allegedly conspired with the corporate defendants and approved of, participated in or acquiesced

---

1. Banff common stock traded at prices as high as $18 per share in 1966.

in the transactions with the corporate defendants.

### Subject Matter Jurisdiction

Plaintiff predicated subject matter jurisdiction upon Section 27 of the Securities and Exchange Act, 15 U.S.C. § 78aa, which gives the district courts exclusive jurisdiction over all "actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder." The district court concluded that the Act has no extraterritorial application, and that therefore no liability arose under the Act with regard to the sales in question, which took place in Canada between foreign buyers and sellers. The court found nothing to rebut the presumption that the Act was intended to apply only to transactions within the territorial limits of the United States. It also stated that the presumption was reinforced by the "specific mandate" of Section 30(b), 15 U.S.C. § 78dd(b), which provides that the Act does not apply "to any person insofar as he transacts a business in securities without the jurisdiction of the United States. * * .* "

■ We disagree with the district court's conclusion. We believe that Congress intended the Exchange Act to have extraterritorial application in order to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities. In our view, neither the usual presumption against extraterritorial application of legislation nor the specific language of Section 30 (b) show Congressional intent to preclude application of the Exchange Act to transactions regarding stocks traded in the United States which are effected outside the United States, when extraterritorial application of the Act is necessary to protect American investors.

Section 2 of the Exchange Act, 15 U.S.C. § 78b, states that because transactions in securities are affected with "a national public interest" it is "neces-sary to provide for regulation and control of such transactions and of practices and matters related thereto, * * * necessary to make such regulation and control reasonably. * * * complete state commerce and to insure the maintenance of fair and honest markets in such transactions."

■ The Act seeks to regulate the stock exchanges and the relationships of the investing public to corporations which invite public investment by listing on such exchanges. H.R.Rep. No. 1383, 73rd Cong., 2d Sess. (1934), reprinted in 78 Cong.Rec. 7702 (1934). See also statements of Rep.Lea, 78 Cong.Rec. 7861 and Rep.Mapes, 78 Cong.Rec. 7922.

■ Banff common stock is registered and traded on the American Stock Exchange. To protect United States shareholders of Banff common stock, Banff is required to comply with the provisions of the Securities Exchange Act concerning financial reports to the SEC, § 13, 15 U.S.C. § 78m; proxy solicitation, § 14, 15 U.S.C. § 78n, and reports of insider holdings, § 16, 15 U.S.C. § 78p. Similarly, the anti-fraud provision of § 10(b), which enables the Commission to prescribe rules "necessary or appropriate in the public interest or for the protection of investors" reaches beyond the territorial limits of the United States and applies when a violation of the Rules is injurious to United States investors. "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if [the actor] had been present at the [time of the detrimental] effect, if the state should succeed in getting him within its power." Strassheim v. Daily, 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911).

The Commission has recognized the broad extraterritorial applicability of the Act and has specifically exempted certain foreign issuers from the operation of Sections 14 and 16 of the Act, when enforcement would be impractical. Rule 3a12–3, 17 CFR 240, 3a12–3 (1967).

The Commission has applied Section 15 (a), 15 U.S.C. § 78o, to foreign broker-dealers who transact business through use of the mails. See Rule 17a–7, 17 CFR § 240.17a (1967); 2 Loss, Securities Regulation, 1292 n. 15 (2d ed. 1961). Although it has the power to grant exemptions from rules under § 10 (b), see Rules 10b–6(d), 10b–7(n), 1 Loss, Securities Regulation, 799 n. 48 (2d ed. 1961), the Commission has not promulgated a rule exempting foreign transactions from Rule 10b–5.[2]

■ The provision contained in Section 30(b) does not alter our conclusion that the Exchange Act has extraterritorial application. In our view, while section 30(b) was intended to exempt persons conducting a business in securities through foreign securities markets from the provisions of the Act, it does not preclude extraterritorial application of the Exchange Act to persons who engage in isolated foreign transactions.

■ Section 30, entitled "Foreign Securities Exchanges," [3] deals with the extent to which the Act applies to persons effecting securities transactions through foreign exchanges. Section 30 (a) empowers the SEC to regulate all brokers and dealers who use the mails or interstate commerce, for the purpose of effecting a transaction in American securities on exchanges outside the United States. 2 Loss, Securities Regulation, 1170 n. 2 (2d ed. 1961). It was intended to prevent evasion of the Act through transactions on foreign exchanges. See Hearings on S.Res. 89 (72d Cong.), and S.Res. 56 and S.Res. 97 (73d Cong.) before the Committee on Banking and Currency, 73d Cong., 2d Sess. part 15, pp. 6569, 6578–79 (1934).

Section 30(b) states that the Act does not apply in the absence of SEC rule to prevent evasion of the Act to "any person insofar as he transacts a business in securities without the jurisdiction of the United States." The language of § 30 (b) must be construed in light of the purpose of the subsection, and the definitions of terms contained in § 3(a) of the Act.

■ The purpose of this subsection is to permit persons in the securities business to conduct transactions in securities outside of the United States without complying with the burdensome reporting requirement of the Act and without being subject to its regulatory provisions, except insofar as the Commission finds it necessary and appropriate to regulate such transactions to prevent evasion of the Act. It is also designed to take the Commission out of the business of regulating foreign security exchanges unless the Commission deems regulation necessary to prevent evasion of the domestic regulatory scheme.[4] The exemption relieves the Commission of the impossible task of enforcing American securities law upon persons whom it could not subject to the sanctions of the

2. However, a transaction conducted entirely outside of the United States would not violate § 10(b) since the requisite use of interstate commerce or the mails would be lacking. See discussion infra.

3. "Section 30. (a) It shall be unlawful for any broker or dealer, directly or indirectly, to make use of the mails or of any means or instrumentality of interstate commerce for the purpose of effecting on an exchange not within or subject to the jurisdiction of the United States, any transaction in any security the issuer of which is a resident of or is organized under the laws of, or has its principal place of business in, a place within or subject to the jurisdiction of the United States, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors or to prevent the evasion of this title.

(b) The provisions of this title or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this title."

4. The SEC has not promulgated any rules or regulations under § 30.

**208**

Act for actions upon which it could not bring its investigatory powers to bear.

If § 30(b) had been meant to exempt every transaction by any person outside of the United States it would have been drafted to state that the Act does not apply to "any transaction in any security outside the jurisdiction of the United States," a phrase used in § 30(a). The drafters used the phrase "any person insofar as he transacts a business in securities without the jurisdiction of the United States" in § 30(b) because it is a term which would exempt the business transactions not only of brokers and dealers but also of banks. The term "brokers and dealers," used in § 30(a), could not be used because the definitions of "broker" and "dealer" in §§ 3(a) (4) and 3(a) (5), 15 U.S.C. § 78c(a) (4) and (5), specifically exclude "banks" as defined in § 3(a) (6), 15 U.S.C. § 78c (a) (6). It is precisely the terminology that appears in § 30(b), when construed in light of § 3(a) (4) and (5) that exempts brokers and dealers and banks otherwise subject to the Act insofar as they conduct transactions not subject to § 30(a) outside the United States, even though their United States transactions are subject to the Act.

In Kook v. Crang, 182 F.Supp. 388 (S.D.N.Y.1960) the Court properly held that § 30(b) exempted from the margin requirements of Section 7(c) of the Act, 15 U.S.C. § 78g(c), sales to a United States citizen of Canadian stock in Canada by a Canadian broker, since the transactions were outside of the United States and part of the Canadian firm's business in securities. 2 Loss, Sec.Reg. 1292 n. 15 (2d ed. 1961). The Court found in § 30(b) a Congressional intent to exempt from application of the Act transaction of a business in securities outside the United States.

This holding was extended in Ferraioli v. Cantor, CCH Fed.Sec.L.Rep. ¶ 91, 615 (S.D.N.Y.1965) to exempt an isolated transaction, not part of a business in securities, the private sale in Canada of controlling shares of a New York corporation in which plaintiff was a minority shareholder, on the ground that the Exchange Act does not have extraterritorial application. The Court reasoned that if Congress specifically exempted foreign business in securities it intended to exempt isolated transactions as well. We disagree with this reasoning.

We find that the language and purpose of § 30(b) show that it was not meant to exempt transactions that are conducted outside the jurisdiction of the United States unless they are part of a "business in securities." Indeed, since Congress found it necessary to draft an exemptive provision for certain foreign transactions and gave the Commission power to make rules that would limit this exemption, the presumption must be that the Act was meant to apply to those foreign transactions not specifically exempted.

We hold that the district court has subject matter jurisdiction over violations of the Securities Exchange Act although the transactions which are alleged to violate the Act take place outside the United States, at least when the transactions involve stock registered and listed on a national securities exchange, and are detrimental to the interests of American investors. See Ford v. United States, 273 U.S. 593, 619–624, 47 S.Ct. 531, 71 L.Ed. 793 (1927); United States v. Pizzarusso, 388 F.2d 8 (2d Cir. Jan. 9, 1968); United States v. Aluminum Company of America, 148 F.2d 416, 443–444 (2d Cir. 1945).

However, the district court found that the only harm alleged was to the foreign corporation on whose behalf plaintiff brought the action. We do not agree. A fraud upon a corporation which has the effect of depriving it of fair compensation for the issuance of its stock would necessarily have the effect of reducing the equity of the corporation's shareholders and this reduction in equity would be reflected in lower prices bid for the shares on the domestic stock market. This impairment of the value of American invest-

ments by sales by the issuer in a foreign country, allegedly in violation of the Act, has in our view, a sufficiently serious effect upon United States commerce to warrant assertion of jurisdiction for the protection of American investors and consideration of the merits of plaintiff's claim.[5] J. I. Case Co. v. Borak, 377 U.S. 426, 431–434, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). See Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 547 (2d Cir. 1967).

### Summary Judgment

Since we conclude that the district court had subject matter jurisdiction we must go on to examine plaintiff's second claim: that defendants were not entitled to summary judgment under Rules 12(c) and 56. Fed.R.Civ. Pro. We agree with the trial court that on motion for summary judgment plaintiff's unsupported allegations based upon information and belief cannot be credited where they are contradicted by the affidavits on personal knowledge which defendants submitted in support of their motion. We further agree that on the record, plaintiff has shown at most a breach of fiduciary duty by Banff's directors and that this is insufficient to constitute a cause of action under § 10 (b) of the Exchange Act.

Under Rule 12(c), if affidavits are submitted to support a motion for judgment on the pleadings, the motion is treated as one for summary judgment and disposed of as provided by Rule 56. Rule 56(e) requires affidavits to be made on personal knowledge. It specifically states "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere alle-

gations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

Defendants submitted in support of their motion affidavits on the personal knowledge of the President of Banff Oil, the President of Aquitaine, and the Manager of the Industrial Division of Paribas, all of whom are directors of Banff as well. Plaintiff submitted an affidavit by its attorney stating that "the facts are set forth in plaintiff's memorandum of law and will not be repeated herein." On these papers, plus plaintiff's verified complaint, also on information and belief, summary judgment for defendants was granted. The trial court correctly ruled that when plaintiff failed to submit affidavits on personal knowledge in support of the complaint in opposition to defendants' affidavits on personal knowledge, factual issues were to be resolved against the plaintiff wherever defendants' affidavits conflict with the unsupported allegations of the complaint upon information and belief. E. g., Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); Union Insurance Society of Canton, Ltd. v. William Gluckin & Co., 353 F.2d 946, 952 (2d Cir. 1965); 6 Moore, Federal Practice, ¶ 56.22[1] at 2803, 2806 (1965). Our statement of the facts at the beginning of the opinion is an application of this principle to the pleadings and motion papers.

### Use of Interstate Commerce

There can be no violation under Section 10[6] unless a rule of the Commission

---

5. However, if the wrong alleged also constitutes the basis for a cause of action under foreign law a district court might decline to exercise its jurisdiction under the doctrine of *forum non conveniens*. See Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633 (2d Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956).

6. "Section 10. It shall be unlawful for any person, directly or indirectly, by the use

of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules

is contravened "directly or indirectly," by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange. See generally 3 Loss, Sec.Reg. 1519–1524 (2d ed. 1961). The trial court found that the transactions in question were essentially Canadian, with insufficient contacts with the United States to fall within § 10(b) of the Act. We are uncertain whether the Court's finding was directed at the issues of extraterritorial application of the Exchange Act or at the jurisdictional requirements of § 10. In either case we disagree with its conclusion. We have already discussed the reasons why a foreign purchase or sale of treasury shares by a corporation has sufficient effect upon interstate commerce to warrant extraterritorial application of the Exchange Act.

The present question is not whether this limited use of the mails and the facilities of interstate commerce would be a sufficient basis for subject matter jurisdiction over a foreign transaction which would otherwise be exempt from the Act, see Kook v. Crang, supra, but whether, once it has been determined that the Act applies to a particular foreign transaction, there is a use of the mails or interstate commerce sufficient to meet the requirement of § 10(b). We find that defendant's affidavits show a use of interstate commerce or the mails sufficient to bring both transactions within the scope of Section 10(b).

■ Since defendants admit that the Aquitaine purchase was delayed pending the successful conclusion of negotiations with the Treasury Department regarding tax rulings and negotiations with the American Stock Exchange regarding the listing of the additional shares, we find, on this record, that these negotiations were a part of the scheme for the sale of treasury stock to Aquitaine. And

since it appears that, as plaintiff alleges, these negotiations with United States government and stock exchange officials must have made some use of the mails or other facilities of interstate commerce, there was at the very least use of interstate commerce[7] or the mails sufficient to bring the sales transactions within the scope of Section 10(b). Hooper v. Mountain States Securities Corp., 282 F.2d 195, 204 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).

■ The Paribas transaction likewise involved negotiations which must have taken place in part in the United States or made some use of the mails or interstate commerce. Furthermore, the purchase agreement was mailed from Paribas in New York to Banff in Canada; this in itself would establish a use of the mails sufficient to meet the requirement of Section 10.

### Rule 10b–5

Plaintiff's theory of its cause of action is that "Banff was defrauded by its directors and controlling shareholder who combined to force it to sell treasury shares at the prevailing market price when they knew that the price was an artificially low one." In other words, plaintiff contends that defendants violated § 10(b) and Rule 10b–5 by causing Banff to issue shares to defendant corporations at the current market price at a time when all the defendants knew that Banff had made an oil discovery which, if known to the public, would have raised the market price considerably. For purposes of the motion the court below rejected plaintiff's claim of the existence of a conspiracy and defendants' claims that at the time of the transaction they did not have material information and assumed that at the time of the sales in question the buyers and Banff's directors all knew that Banff

---

and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

7. The term "interstate commerce," as used in the Exchange Act, encompasses commerce "between any foreign country and any State." § 3(a) (17), 15 U.S.C. § 78c (a) (17).

had made a valuable discovery. We agree with the district court's conclusion that plaintiff failed to state a cause of action under Rule 10b–5[8] because there was no fraud and the allegations amounted to nothing more than breach of fiduciary duty by the controlling shareholder and directors.

The district court properly treated Banff's sales as arm's length transactions since plaintiff failed to produce affidavits on personal knowledge to support his allegations of conspiracy among the defendants to contradict the defendants' affidavits which categorically denied the existence of any conspiracy, Scolnick v. Lefkowitz, 329 F.2d 716 (2d Cir. 1964).

 We do not see how Banff's directors, in authorizing sales of treasury stock in arm's length transactions in which all parties possessed the same information, can properly be characterized as participating in a "manipulative or deceptive device or contrivance" in connection with a sale so as to fit within § 10(b) merely because some shareholders now consider the sale price too low. Plaintiff's claim fails to state a cause of action under § 10(b) because it does not show that the corporation was deceived. The directors, who were authorized to act on behalf of the corporation in these transactions, were all concededly in full possession of the material information, and we find no basis, on the facts before us, for refusing to impute their knowledge to the corporation.

 A corporation can act only through its agents and officers and can know only what its agents and officers know. Bergeson v. Life Insurance Corporation of America, 265 F.2d 227, 232

(10th Cir.), cert. denied, 360 U.S. 932, 79 S.Ct. 1452, 3 L.Ed.2d 1545 (1959); City of Philadelphia, Pa. v. Westinghouse Electric Corporation, 205 F.Supp. 830, 831 (E.D.Pa.1962); Ballantine on Corporations (Rev.Ed.1946) § 61, pp. 152–155; 19 C.J.S. Corporations § 1078, p. 613; Restatement (Second) of Agency § 9(3) (1957). If the persons entitled in the ordinary course to participate in authorizing a securities transaction on behalf of the corporation have not been fully informed, it may be said that the corporation has not been fully informed. Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964). In general, if the corporation's agents have not been deceived, neither has the corporation. However, as in other situations governed by agency principles, knowledge of the corporation's officers and agents is not imputed to it when there is a conflict between the interests of the officers and agents and the interests of the corporate principal. Monier v. Guaranty Trust Co. of New York, 82 F.2d 252, 254 (2d Cir.), cert. denied, 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393 (1936); Maryland Casualty Co. v. Tulsa Industrial Loan & Investment Co., 83 F.2d 14, 16–17 (10th Cir. 1936); Ohio Millers' Mutual Insurance Co. v. Artesia State Bank, 39 F.2d 400, 402 (5th Cir. 1930); Ballantine on Corporations, supra; 19 C.J.S. Corporations § 1084; Restatement (Second) of Agency § 282(1) (1958). See Ruckle v. Roto American Corp., 339 F.2d at 29. Therefore, a corporation may be defrauded in a stock transaction even when all of its directors know all of the material facts, if the conflict between the interests of one or more of the directors and the in-

---

8. "RULE 10b–5. EMPLOYMENT OF MANIPULATIVE AND DECEPTIVE DEVICES.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

terests of the corporation prevents effective transmission of material information to the corporation, in violation of Rule 10b–5(2).[9] See O'Neill v. Maytag, 2 Cir., 339 F.2d 764 at 767.

■■■ While the purchaser in the Aquitaine transaction had three representatives on Banff's board of directors and was Banff's controlling shareholder, the Aquitaine representatives on the Banff board abstained from the authorization vote and shareholder ratification by Aquitaine was not required for the sale. Under these circumstances, we cannot refuse to impute the directors' knowledge to the corporation on the ground that directors participating in the corporate decision had a conflicting personal interest in the transaction. Compare Pappas v. Moss, 393 F.2d 865 (3d Cir., 1968). Since the directors were all fully informed and since only the non-interested directors participated in the vote authorizing the sale, there is no deception of the corporation and no violation of § 10(b) and Rule 10b–5 even though it may be that the directors, by authorizing sales of shares for inadequate consideration, may have breached their fiduciary duty to the corporation.

■ Section 10(b) does not encompass all corporate wrongs involving securities transactions. Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 545–546 (2d Cir. 1967); O'Neill v. Maytag, 339 F.2d at 768; Hoover v. Allen, 241 F.Supp. 213, 226–229 (S.D.N.Y. 1965); Carliner v. Fair Lanes, Inc., 244 F.Supp. 25 at 30. To the extent that Section 10(b) and Rule 10b–5 make conduct unlawful, the courts have implied a civil remedy for those damaged by the violation who are members of the class for whose benefit the statute was enacted. Fischman v. Raytheon Manu-

facturing Co., 188 F.2d 783, 787 (2d Cir. 1951). See cases cited id. at 787 n. 4.

■ The purpose of § 10(b) is to enable buyers and sellers to make a "proper appraisal of the value of securities," § 2(3) (b), and prevent manipulation and control of prices which would cause excessive speculation. § 2(3). See A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2d Cir. 1967). In order to accomplish this purpose, the courts have held that "those persons engaged in buying and selling and trading" have an implied civil cause of action for violations of § 10(b) and Rule 10b–5. Hooper v. Mountain States Securities Corp., 282 F.2d at 202. However, the purposes of the Securities Exchange Act, and more particularly, § 10(b), would normally not be furthered by permitting persons on whose behalf others buy, sell and trade to bring actions under § 10(b) against their agents. For example, the beneficiary of a trust agreement does not have an implied civil cause of action under § 10(b) and Rule 10b–5 against a trustee who, with full knowledge of all material information, sells shares from the trust corpus in an arm's length transaction for what the beneficiary considers to be inadequate consideration. If the trustee made a poor decision after considering the material information, the beneficiary's loss is not of the sort which § 10(b) was meant to prevent and even though a literal interpretation of the language in Rule 10b–5 could cover the trustee's acts, the beneficiary is not entitled to bring a civil action in reliance upon § 10(b)'s criminal liabilities.

■ Similarly, while a corporation would be entitled to protection under § 10(b) when material misrepresentations

---

**9.** It is recognized that in many circumstances the knowledge of some of the members of the board of directors is not by itself sufficient to charge the corporation with knowledge. Ruckle v. Roto American Corp., supra; Ohio Millers' Mutual Insurance Co. v. Artesia State Bank, 39 F.2d at 403; First National Bank of Glasgow, Mont. v. Carroll, 46

N.D. 62, 179 N.W. 664 (1920); Reynolds v. Third National Bank, 225 S.W. 901 (Mo.1920); Weissman v. Weissman, Inc., 374 Pa. 470, 97 A.2d 870 (1953); Hudson v. Alaska Airlines, Inc., 43 Wash.2d 71, 260 P.2d 321 (1953); Ballantine on Corporations, supra; 19 C.J.S. Corporations § 1079b.

are made in a securities transaction to those acting as its agents, § 10(b) does not protect shareholders from directors who sell shares from the corporate treasury to third parties in arm's length transactions for consideration which the shareholders consider inadequate. The corporation received the protection to which it was entitled under the Act because the persons authorized to carry out the transaction on behalf of the corporation were in no way deceived, and there is no reason why their knowledge is not attributed to the corporation.

Nevertheless appellant argues that it would be anomalous to hold that no fraud or deception was practiced upon Banff within § 10(b) because all of its directors had material information when in situations where only some of the directors had material information the corporation can recover under § 10(b) and Rule 10b-5. This argument is beside the point because, as we have shown, the crucial question is not how many directors share the material information, but whether or not their knowledge is imputed to the corporation. We think that it would be a greater anomaly to hold that the corporation is defrauded within the meaning of § 10(b) when its shares are sold under circumstances in which the directors authorizing the sale could not have recovered under § 10(b) if they had sold their own shares, when plaintiff has failed to show any reason why the directors' knowledge cannot be imputed to the corporation. If the corporation's investment judgment has not been impaired, because those authorized to act on its behalf were not deceived and all material information has imparted to the corporation through them, provision of a remedy under § 10(b) for the wrong alleged would not be consonant with the purpose of this section of the Act. See Ruckle v. Roto American Corp., 339 F.2d at 29; O'Neill v.

Maytag, 339 F.2d at 767–768; Hoover v. Allen, 241 F.Supp. at 228. We have not departed from the view we expressed in *Ruckle* that the majority, or even the entire board of directors may be held to have participated in a scheme to defraud their corporation in violation of Rule 10b-5. See O'Neill v. Maytag, 339 F.2d 764, 768 (2d Cir. 1964). In cases where it is alleged that the corporation's investment judgment has been impaired, either because some or all of those entitled to vote in the ordinary course upon the purchase or sale have been deceived, Ruckle v. Roto American Corp., *supra*, or because some or all of those who purchased shares from or sold shares to the corporation participated in the corporate decision, Pappas v. Moss, 393 F.2d 865 (3d Cir., 1968); Kane v. Central American Mining & Oil, Inc., 235 F.Supp. 559 (S.D.N.Y.1964), the corporation may bring an action under § 10(b) and Rule 10b-5. See Fleischer, "Federal Corporation Law": An Assessment, 78 Harv.L.Rev. 1146, 1160–1167 (1965); Note, 18 Stan.L.Rev. 1339, 1342–1343 (1966).

Plaintiff has failed to make the necessary showing that those authorized to act on behalf of the corporation were deceived or that their knowledge should not be deemed the corporation's knowledge. There is no allegation that either of the purchasers had information not known to Banff's representatives or that they were guilty of deception or failure to disclose material information. The district court properly concluded that in these arm's length transactions in which all parties possessed the same information,[10] plaintiff failed to state a cause of action against either purchaser under Rule 10b-5. Ruckle v. Roto American Corp., *supra*; Carliner v. Fair Lanes, Inc., 244 F.Supp. at 29.

Since there is no reason to believe that plaintiff could recast his complaint to

---

10. Appellant does not contend that failure to disclose to the public the information available to the directors concerning Banff's exploration activities was a violation of the securities laws or a breach of fiduciary duty. It is conceded that under Alberta law Banff was permitted to withhold detailed information for one year after completion of exploratory drilling on Crown reservations land.

**214**

meet the requirements of the statute through the use of discovery, we need not decide whether the district court abused its discretion in refusing plaintiff's request for discovery before granting summary judgment.

The judgment is affirmed.

HAYS, Circuit Judge (concurring in part and dissenting in part):

I concur in Judge Lumbard's distinguished opinion on the issue of jurisdiction.

I am constrained to dissent on the point of the applicability to the facts of this case of the provisions of Section 10(b) and, more particularly, Rule 10b-5.

Defendants are alleged to have caused Banff to sell treasury shares at a price far below the fair price of such shares. In doing so defendants took advantage of their special relationship to Banff by reason of which they knew of Banff's discovery of extremely valuable oil reserves,—information which was clearly material to the purchase of the securities.

The complaint alleges a scheme to defraud the corporation by transferring corporate property to the corporation's majority stockholder and to an affiliate of the majority stockholder for a vastly inadequate consideration. My brothers do not absolve the defendants of fraud by calling their action a breach of fiduciary duty. There is no reason for making that distinction since such a breach of fiduciary duty as is here alleged clearly constitutes fraud.

The majority "do not see how Banff's directors * * * can properly be characterized as participating in a 'manipulative or deceptive device or contrivance' in connection with a sale so as to fit within § 10(b) merely because some shareholders now consider the sale price too low." This statement completely disregards allegations of the complaint which are based upon matters of record and which establish that the treasury stock was sold at a price which did not reflect in any way the value of the recently discovered oil reserves. Whatever reason there may be for denying plaintiffs' recovery in this case it certainly cannot be because their complaint is deficient in its allegation that Banff was bilked of some millions of dollars by the transactions in question.

Rule 10b-5 [1] makes it unlawful for any person

"(1) to employ any device, scheme, or artifice to defraud" or

"(3) to engage in any act, practice, or course of business which operates * * * as a fraud * * * upon any person, in connection with the purchase or sale of any security."

The acts in which defendants are alleged to have engaged clearly fall within the literal language of both of these subdivisions of Rule 10b-5.

The purpose of Section 10(b) and Rule 10b-5 is apparent from their language. That purpose is simply to prevent in interstate commerce the perpetration of fraud in connection with the sale of securities.

"Quite obviously the broad purpose of this legislation was to keep the channels of interstate commerce, the mail, and national security exchanges pure from fraudulent schemes, tricks, devices, and all forms of manipulation." Hooper v. Mountain States Securities Corporation, 282 F.2d 195, 202 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed. 2d 693 (1961).

Reluctance to see the federal courts involved in this broad field cannot justify rejection of a case that comes so clearly within the ambit of the statute as does the case which we are now considering.

The majority believe that the complaint fails to "state a cause of action under § 10(b) because it does not show that the corporation was deceived" since the directors "who were authorized to act on behalf of the corporation in these transactions, were all concededly in full

1. See Note 8 supra.

possession of the material information" and the knowledge of the directors is to be "imputed to the corporation."

Endowing a corporation with a fictitious "personality," so that, for example, it has "knowledge," is a useful device for the analysis of many problems. But it can also constitute a trap for the unwary when they ascribe reality to the fictions. What the majority is actually saying is that since the directors *were* the corporation for the purposes of the questioned transactions the corporation must have known what the directors knew, or, in other words, the directors knew what the directors knew. There is, of course, no justification for interposing the corporate fiction between the directors and the minority stockholders who were the victims of the directors' fraudulent actions. In order to establish fraud it is surely not necessary to show that the directors deceived themselves. It must be enough to show that they deceived the shareholders, the real owners of the property with which the directors were dealing. Deception of the shareholders (with the exception of the majority stockholder which was a party to the transactions) is established by showing that the directors withheld from them information that would have revealed the true value of the treasury stock.

The directors cannot take refuge behind the law permitting the information as to the discovery of the reserves to be withheld for one year. Such a law does not constitute a license to the directors to deal with the property as if no such discovery had been made. To argue to the contrary would be to argue that the directors could give the oil reserves away, as they in fact did in part, by selling the treasury stock at a price which did not reflect the value of the reserves.

2. The abstention of the "Aquitaine directors" on the vote for the sale to Aquitaine is hardly worthy of mention. As I said in my dissenting opinion in Alleghany Corporation v. Kirby, 344 F.2d 571 (2d Cir. 1965), cert. dismissed as improvidently granted, 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966):

What we have here then is a scheme by which the directors of Banff gave to the controlling stockholder[2] and an affiliated corporation some millions of dollars worth of the corporation's property. A plainer case of fraud would be hard to find.

"No one who knows anything about the conduct of corporate enterprise considers that the major stockholder's withdrawal from the room when a vote is taken amounts to anything more than an empty ceremonial."