Justice Stevens,
with whom
Justice Ginsburg joins, concurring in the judgment.
While I agree that petitioners have failed to state a claim on which relief can be granted, my reasoning differs from the Court’s. I would adhere to the general approach that has been the law in the Second Circuit, and most of the rest of the country, for nearly four decades.
I
Today the Court announces a new “transactional test,” ante, at 269, for defining the reach of § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U. S. C. §78j(b), and SEC Rule 10b-5, 17 CFR § 240.10b-5(b) (2009): Henceforth, those provisions will extend only to “transactions in securities listed on domestic exchange^] and domestic transactions in other securities,” ante, at 267. If one confines one’s gaze to the statutory text, the Court’s conclusion is a plausible one. But the federal courts have been construing § 10(b) in a different manner for a long time, and the Court’s textual analysis is not nearly so compelling, in my view, as to warrant the abandonment of their doctrine.
The text and history of § 10(b) are famously opaque on the question of when, exactly, transnational securities frauds fall within the statute’s compass. As those types of frauds became more common in the latter half of the 20th century, the federal courts were increasingly called upon to wrestle with that question. The Court of Appeals for the Second Circuit, located in the Nation’s financial center, led the effort. Beginning in earnest with Schoenbaum v. Firstbrook, 405 F. 2d *275 200, rev’d on rehearing on other grounds, 405 F. 2d 215 (1968) (en banc), that court strove, over an extended series of cases, to “discern” under what circumstances “Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted to [transnational] transactions,” 547 F. 3d 167, 170 (2008) (internal quotation marks omitted). Relying on opinions by Judge Henry Friendly,[1] the Second Circuit eventually settled on a conduct-and-effects test. This test asks “(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens.” Id., at 171. Numerous cases flesh out the proper application of each prong.
The Second Circuit’s test became the “north star” of § 10(b) jurisprudence, ante, at 257, not just regionally but nationally as well. With minor variations, other courts converged on the same basic approach.[2] See Brief for United States as Amicus Curiae 15 (“The courts have uniformly agreed that Section 10(b) can apply to a transnational securities fraud either when fraudulent conduct has effects in the United States or when sufficient conduct relevant to the fraud occurs in the United States”); see also 1 Restatement (Third) of Foreign Relations Law of the United States § 416 (1986) (setting forth conduct-and-effects test). Neither Con *276 gress nor the Securities and Exchange Commission acted to change the law. To the contrary, the Commission largely adopted the Second Circuit’s position in its own adjudications. See ante, at 272.
In light of this history, the Court’s critique of the decision below for applying “judge-made rules” is quite misplaced. Ante, at 261. This entire area of law is replete with judge-made rules, which give concrete meaning to Congress’ general commands.[3] “When we deal with private actions under Rule 10b-5,” then-Justice Rehnquist wrote many years ago, “we deal with a judicial oak which has grown from little more than a legislative acorn.” Blue Chip Stamps v. Manor Drug Stores, 421 U. S. 723, 737 (1975). The “'Mother Court’” of securities law tended to that oak. Id., at 762 (Blackmun, J., dissenting) (describing the Second Circuit). One of our greatest jurists — the judge who, “without a doubt, did more to shape the law of securities regulation than any [other] in the country”[4] — was its master arborist.
The development of § 10(b) law was hardly an instance of judicial usurpation. Congress invited an expansive role for judicial elaboration when it crafted such an open-ended statute in 1934. And both Congress and the Commission subsequently affirmed that role when they left intact the relevant statutory and regulatory language, respectively, throughout all the years that followed. See Brief for Alecta pensionsforsakring, omsesidigt et al. as Amici Curiae 31-33; cf. Musick, Peeler & Garrett v. Employers Ins. of Wausau, *277 508 U. S. 286, 294 (1993) (inferring from recent legislation Congress’ desire to “acknowledge” the Rule 10b-5 action without “entangling” itself in the precise formulation thereof). Unlike certain other domains of securities law, this is “a case in which Congress has enacted a regulatory-statute and then has accepted, over a long period of time, broad judicial authority to define substantive standards of conduct and liability,” and much else besides. Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U. S. 148, 163 (2008).
This Court has not shied away from acknowledging that authority. We have consistently confirmed that, in applying § 10(b) and Rule 10b-5, courts may need “to flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance.” Blue Chip, 421 U. S., at 737. And we have unanimously “recogniz[ed] a judicial authority to shape . . . the 10b-5 cause of action,” for that is a task “Congress has left to us.” Musick, Peeler, 508 U. S., at 293, 294; see also id., at 292 (noting with approval that “federal courts have accepted and exercised the principal responsibility for the continuing elaboration of the scope of the 10b-5 right and the definition of the duties it imposes”). Indeed, we have unanimously endorsed the Second Circuit’s basic interpretive approach to § 10(b) — ridiculed by the Court today — of striving to “divinje] what Congress would have wanted,” ante, at 261.[5] “Our task,” we have said, is “to at *278 tempt to infer how the 1934 Congress would have addressed the issue.” Mustek, Peeler, 508 U. S., at 294.
Thus, while the Court devotes a considerable amount of attention to the development of the case law, ante, at 255-260, it draws the wrong conclusions. The Second Circuit refined its test over several decades and dozens of cases, with the tacit approval of Congress and the Commission and with the general assent of its sister Circuits. That history is a reason we should give additional weight to the Second Circuit’s “judge-made” doctrine, not a reason to denigrate it. “The longstanding acceptance by the courts, coupled with Congress’ failure to reject [its] reasonable interpretation of the wording of § 10(b), . . . argues significantly in favor of acceptance of the [Second Circuit] rule by this Court.” Blue Chip, 421 U. S., at 733.
II
The Court’s other main critique of the Second Circuit’s approach — apart from what the Court views as its excessive reliance on functional considerations and reconstructed congressional intent — is that the Second Circuit has “disregarded] ” the presumption against extraterritoriality. Ante, at 255. It is the Court, however, that misapplies the presumption, in two main respects.
First, the Court seeks to transform the presumption from a flexible rule of thumb into something more like a clear statement rule. We have been here before. In the case on which the Court primarily relies, EEOC v. Arabian American Oil Co., 499 U. S. 244 (1991) (Aramco), Chief Justice Rehnquist’s majority opinion included a sentence that appeared to make the same move. See id., at 258 (“Congress’ awareness of the need to make a clear statement that a statute applies overseas is amply demonstrated by the numerous *279 occasions on which it has expressly legislated the extraterritorial application of a statute”). Justice Marshall, in dissent, vigorously objected. See id., at 261 (“[Cjontrary to what one would conclude from the majority’s analysis, this canon is not a ‘clear statement’ rule, the application of which relieves a court of the duty to give effect to all available indicia of the legislative will”).
Yet even Aramco — surely the most extreme application of the presumption against extraterritoriality in my time on the Court[6] — contained numerous passages suggesting that the presumption may be overcome without a clear directive. See id., at 248-255 (majority opinion) (repeatedly identifying congressional “intent” as the touchstone of the presumption). And our cases both before and after Aramco make perfectly clear that the Court continues to give effect to “all available evidence about the meaning” of a provision when considering its extraterritorial application, lest we defy Congress’ will. Sale v. Haitian Centers Council, Inc., 509 U. S. 155, 177 (1993) (emphasis added).[7] Contrary to Justice Scalia’s *280 personal view of statutory interpretation, that evidence legitimately encompasses more than the enacted text. Hence, while the Court’s dictum that “[w]hen a statute gives no clear indication of an extraterritorial application, it has none,” ante, at 255, makes for a nice catchphrase, the point is overstated. The presumption against extraterritoriality can be useful as a theory of congressional purpose, a tool for managing international conflict, a background norm, a tiebreaker. It does not relieve courts of their duty to give statutes the most faithful reading possible.
Second, and more fundamentally, the Court errs in suggesting that the presumption against extraterritoriality is fatal to the Second Circuit’s test. For even if the presumption really were a clear statement (or “clear indication,” ante, at 255, 265) rule, it would have only marginal relevance to this case.
It is true, of course, that “this Court ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations,” F. Hoffmann-La Roche Ltd v. Empagran S. A., 542 U. S. 155, 164 (2004), and that, absent contrary evidence, we presume “Congress is primarily concerned with domestic conditions,” Foley Bros., Inc. v. Filardo, 336 U. S. 281, 285 (1949). Accordingly, the presumption against extraterritoriality “provides a sound basis for concluding that Section 10(b) does not apply when a securities fraud with no effects in the United States is hatched and executed entirely outside this country.” Brief for United States as Amicus Curiae 22. But that is just about all it provides a sound basis for concluding. And the conclusion is not very illuminating, because no party to the litigation disputes it. No one contends that § 10(b) applies to wholly foreign frauds.
*281 Rather, the real question in this case is how much, and what kinds of, domestic contacts are sufficient to trigger application of § 10(b).[8] In developing its conduct-and-effects test, the Second Circuit endeavored to derive a solution from the Exchange Act’s text, structure, history, and purpose. Judge Friendly and his colleagues were well aware that United States courts “cannot and should not expend [their] resources resolving cases that do not affect Americans or involve fraud emanating from America.” 547 F. 3d, at 175; see also id., at 171 (overriding concern is “ ‘whether there is sufficient United States involvement’ ” (quoting Itoba Ltd. v. Lep Group PLC, 54 F. 3d 118, 122 (CA2 1995))).
The question just stated does not admit of an easy answer. The text of the Exchange Act indicates that § 10(b) extends to at least some activities with an international component, but, again, it is not pellucid as to which ones.[9] The Second *282 Circuit draws the line as follows: Section 10(b) extends to transnational frauds “only when substantial acts in furtherance of the fraud were committed within the United States,” SEC v. Berger, 322 F. 3d 187, 193 (CA2 2003) (internal quotation marks omitted), or when the fraud was “'intended to produce’ ” and did produce “ 'detrimental effects within’ ” the United States, Schoenbaum, 405 F. 2d, at 206.[10]
This approach is consistent with the understanding shared by most scholars that Congress, in passing the Exchange Act, “expected U. S. securities laws to apply to certain international transactions or conduct.” Buxbaum, Multinational Class Actions Under Federal Securities Law: Managing Jurisdictional Conflict, 46 Colum. J. Transnat’l L. 14, 19 (2007); see also Leasco Data Processing Equip. Corp. v. Maxwell, 468 F. 2d 1326, 1336 (CA2 1972) (Friendly, J.) (detailing evidence that Congress “meant § 10(b) to protect against fraud in the sale or purchase of securities whether or not these were traded on organized United States markets”). It is also consistent with the traditional understanding, regnant in the 1930’s as it is now, that the presumption against extraterritoriality does not apply “when the conduct [at issue] occurs within the United States,” and has lesser force when “the failure to extend the scope of the statute to a foreign setting will result in adverse effects within the United States.” Environmental Defense Fund, Inc. v. Massey, 986 F. 2d 528, 531 (CADC 1993); accord, Restatement (Second) of Foreign Relations Law of the United States § 38 (1964-1965); *283 cf. Small v. United States, 544 U. S. 385, 400 (2005) (Thomas, J., joined by Scalia and Kennedy, JJ., dissenting) (presumption against extraterritoriality “lend[s] no support” to a “rule restricting a federal statute from reaching conduct within U. S. borders”)) Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U. S. 690, 705 (1962) (presumption against extraterritoriality not controlling “[s]inee the activities of the defendants had an impact within the United States and upon its foreign trade”). And it strikes a reasonable balance between the goals of “preventing the export of fraud from America,” protecting shareholders, enhancing investor confidence, and deterring corporate misconduct, on the one hand, and conserving United States resources and limiting conflict with foreign law, on the other.[11] 547 F. 3d, at 175.
Thus, while § 10(b) may not give any “clear indication” on its face as to how it should apply to transnational securities frauds, ante, at 255, 265, it does give strong clues that it should cover at least some of them, see n. 9, supra. And in my view, the Second Circuit has done the best job of discerning what sorts of transnational frauds Congress meant in 1934— and still means today — to regulate. I do not take issue with the Court for beginning its inquiry with the statutory text, rather than the doctrine in the Courts of Appeals. Cf. ante, at 267, n. 9. I take issue with the Court for beginning and ending its inquiry with the statutory text, when the text *284 does not speak with geographic precision, and for dismissing the long pedigree of, and the persuasive account of congressional intent embodied in, the Second Circuit’s rule.
Repudiating the Second Circuit’s approach in its entirety, the Court establishes a novel rule that will foreclose private parties from bringing § 10(b) actions whenever the relevant securities were purchased or sold abroad and are not listed on a domestic exchange.[12] The real motor of the Court’s opinion, it seems, is not the presumption against extraterritoriality but rather the Court’s belief that transactions on domestic exchanges are “the focus of the Exchange Act” and “the objects of [its] solicitude. ” Ante, at 266,267. In reality, however, it is the “public interest” and “the interests of investors” that are the objects of the statute’s solicitude. Europe & Overseas Commodity Traders, S. A. v. Banque Paribas London, 147 F. 3d 118, 125 (CA2 1998) (citing H. R. Rep. No. 1838, 73d Cong., 2d Sess., 32-33 (1934)); see also Basic Inc. v. Levinson, 485 U. S. 224, 230 (1988) (“The 1934 Act was designed to protect investors against manipulation of stock prices” (citing S. Rep. No. 792, 73d Cong., 2d Sess., 1-5 (1934))); Ernst & Ernst v. Hochfelder, 425 U. S. 185, 195 (1976) (“The 1934 Act was intended principally to protect investors . . . ”); S. Rep. No. 1455, 73d Cong., 2d Sess., 68 (1934) (“The Securities Exchange Act of 1934 aims to protect the interests of the public against the predatory opera *285 tions of directors, officers, and principal stockholders of corporations . . . ”)• And while the clarity and simplicity of the Court’s test may have some salutary consequences, like all bright-line rules it also has drawbacks.
Imagine, for example, an American investor who buys shares in a company listed only on an overseas exchange. That company has a major American subsidiary with executives based in New York City; and it was in New York City that the executives masterminded and implemented a massive deception which artificially inflated the stock price — and which will, upon its disclosure, cause the price to plummet. Or, imagine that those same executives go knocking on doors in Manhattan and convince an unsophisticated retiree, on the basis of material misrepresentations, to invest her life savings in the company’s doomed securities. Both of these investors would, under the Court’s new test, be barred from seeking relief under § 10(b).
The oddity of that result should give pause. For in walling off such individuals from § 10(b), the Court narrows the provision’s reach to a degree that would surprise and alarm generations of American investors — and, I am convinced, the Congress that passed the Exchange Act. Indeed, the Court’s rule turns § 10(b) jurisprudence (and the presumption against extraterritoriality) on its head, by withdrawing the statute’s application from cases in which there is both substantial wrongful conduct that occurred in the United States and a substantial injurious effect on United States markets and citizens.
Ill
In my judgment, if petitioners’ allegations of fraudulent misconduct that took place in Florida are true, then respondents may have violated § 10(b), and could potentially be held accountable in an enforcement proceeding brought by the Commission. But it does not follow that shareholders who have failed to allege that the bulk or the heart of the fraud occurred in the United States, or that the fraud had an ad *286 verse impact on American investors or markets, may maintain a private action to recover damages they suffered abroad. Some cases involving foreign securities transactions have extensive links to, and ramifications for, this country; this case has Australia written all over it. Accordingly, for essentially the reasons stated in the Court of Appeals’ opinion, I would affirm its judgment.
The Court instead elects to upend a significant area of securities law based on a plausible, but hardly decisive, construction of the statutory text. In so doing, it pays short shrift to the United States’ interest in remedying frauds that transpire on American soil or harm American citizens, as well as to the accumulated wisdom and experience of the lower courts. I happen to agree with the result the Court reaches in this case. But “I respectfully dissent,” once again, “from the Court’s continuing campaign to render the private cause of action under § 10(b) toothless.” Stoneridge, 552 U. S., at 175 (Stevens, J., dissenting).

 See, e. g., IIT, Int’l Inv. Trust v. Cornfeld, 619 F. 2d 909 (CA2 1980); IIT v. Vencap, Ltd., 519 F. 2d 1001 (CA2 1975); Bersch v. Drexel Firestone, Inc., 519 F. 2d 974 (CA2 1975); Leasco Data Processing Equip. Corp. v. Maxwell, 468 F. 2d 1326 (CA2 1972).

 1 acknowledge that the Courts of Appeals have differed in their applications of the conduct-and-effects test, with the consequence that their respective rulings are not perfectly “cohesive.” Ante, at 259, n. 4. It is nevertheless significant that the other Courts of Appeals, along with the other branches of Government, have “embraced the Second Circuit’s approach,” ante, at 259. If this Court were to do likewise, as I would have us do, the lower courts would of course cohere even more tightly around the Second Circuit’s rule.

 It is true that “when it comes to ‘the scope of [the] conduct prohibited by [Rule 10b-5 and] § 10(b), the text of the statute [has] controlled] our deeision[s].”’ Ante, at 261, n. 5 (quoting Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U. S. 164, 173 (1994); some brackets in original). The problem, when it comes to transnational securities frauds, is that the text of the statute does not provide a great deal of control. As with any broadly phrased, longstanding statute, courts have had to fill in the gaps.

 Loss, In Memoriam: Henry J. Friendly, 99 Harv. L. Rev. 1722, 1723 (1986).

 Even as the Court repeatedly declined to grant certiorari on cases raising the issue, individual Justices went further and endorsed the Second Circuit’s basic approach to determining the transnational reach of § 10(b). See, e. g., Scherk v. Alberto-Culver Co., 417 U. S. 506, 529-530 (1974) (Douglas, J., joined by Brennan, White, and Marshall, JJ., dissenting) (“It has been recognized that the 1934 Act, including the protections of Rule 10b-5, applies when foreign defendants have defrauded American investors, particularly when . . . they have profited by virtue of proscribed conduct within our boundaries. This is true even when the defendant is organized under the laws of a foreign country, is conducting much of its *278 activity outside the United States, and is therefore governed largely by foreign law” (citing, inter alia, Leasco, 468 F. 2d, at 1334-1339, and Sehoenbaum v. Firstbrook, 405 F. 2d 200, rev’d on rehearing on other grounds, 405 F. 2d 215 (CA2 1968) (en bane))).

 And also one of the most short lived. See Civil Rights Act of 1991, § 109, 105 Stat. 1077 (repudiating Aramco).

 See also, e. g., Hartford Fire Ins. Co. v. California, 509 U. S. 764 (1993) (declining to apply presumption in assessing question of Sherman Act extraterritoriality); Smith v. United States, 507 U. S. 197, 201-204 (1993) (opinion for the Court by Rehnquist, C. J.) (considering presumption “[ljastly,” to resolve “any lingering doubt,” after considering structure, legislative history, and judicial interpretations of Federal Tort Claims Act); cf. Sale, 509 U. S., at 188 (stating that presumption “has special force when we are construing treaty and statutory provisions that,” unlike § 10(b), “may involve foreign and military affairs for which the President has unique responsibility”); Dodge, Understanding the Presumption Against Extraterritoriality, 16 Berkeley J. Int’l L. 85,110 (1998) (explaining that lower courts “have been unanimous in concluding that the presumption against extraterritoriality is not a clear statement rule”). The Court also relies on Microsoft Corp. v. AT&T Corp., 550 U. S. 437, 455-456 (2007). Ante, at 265. Yet Microsoft’s articulation of the presumption is a far cry from the Court’s rigid theory. “As a principle of general application,” Microsoft innocuously observed, “we have stated that courts should *280 ‘assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws.’ ” 550 U. S., at 455 (quoting F. Hoffmann-La Roche Ltd v. Empagran S. A., 542 U. S. 155, 164 (2004)).

 Cf. Dodge, 16 Berkeley J. Int’l L., at 88, n. 25 (regardless of whether one frames question as “whether the presumption against extraterritoriality should apply [or] whether the regulation is extraterritorial,” “one must ultimately grapple with the basic issue of what connection to the United States is sufficient to justify the assumption that Congress would want its laws to be applied”).

 By its terms, § 10(b) regulates “interstate commerce,” 15 U. S. C. § 78j, which the Exchange Act defines to include “trade, commerce, transportation, or communication... between any foreign country and any State, or between any State and any place or ship outside thereof.” §78e(a)(17). Other provisions of the Exchange Act make clear that Congress contemplated some amount of transnational application. See, e. g., § 78b(2) (stating, in explaining necessity for regulation, that “[t]he prices established and offered in [securities] transactions are generally disseminated and quoted throughout the United States and foreign countries and constitute a basis for determining and establishing the prices at which securities are bought and sold”); § 78dd(b) (exempting from regulation foreign parties “unless” they transact business in securities “in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this chapter” (emphasis added)); see also Schoenbaum, 405 F. 2d, at 206-208 (reviewing statutory text and legislative history). The Court finds these textual references insufficient to overcome the presumption against extraterritoriality, ante, at 262-264, *282 but as explained in the main text, that finding rests upon the Court’s misapplication of the presumption.

 The Government submits that a “transnational securities fraud violates Section 10(b) if significant conduct material to the fraud’s success occurs in the United States.” Brief for United States as Amicus Curiae 6. I understand the Government’s submission to be largely a repackaging of the “conduct” prong of the Second Circuit’s test. The Government expresses no view on that test’s “effects” prong, as the decision below considered only respondents’ conduct. See id., at 15, n. 2; 547 P. 3d 167, 171 (CA2 2008).

 Given its focus on “domestic conditions,” Foley Bros., Inc. v. Filardo, 336 U. S. 281, 285 (1949), I expect that virtually all “‘foreign-cubed’” actions — actions in which “(1) foreign plaintiffs [are] suing (2) a foreign issuer in an American court for violations of American securities laws based on securities transactions in (3) foreign countries,” 547 F. 3d, at 172— would fail the Second Circuit’s test. As they generally should. Under these circumstances, the odds of the fraud having a substantial connection to the United States are low. In recognition of the Exchange Act’s focus on American investors and the novelty of foreign-cubed lawsuits, and in the interest of promoting clarity, it might have been appropriate to incorporate one bright line into the Second Circuit’s test, by categorically excluding such lawsuits from § 10(b)’s ambit.

 The Court’s opinion does not, however, foreclose the Commission from bringing enforcement actions in'additional circumstances, as no issue concerning the Commission’s authority is presented by this case. The Commission’s enforcement proceedings not only differ from private § 10(b) actions in numerous potentially relevant respects, see Brief for United States as Amicus Curiae 12-13, but they also pose a lesser threat to international comity, id., at 26-27; cf. Empagran, 542 U. S., at 171 (‘“[P]rivate plaintiffs often are unwilling to exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U. S. Government’ ” (quoting Griffin, Extraterritoriality in U. S. and EU Antitrust Enforcement, 67 Antitrust L. J. 159, 194 (1999); alteration in original)).