**Howard BERSCH, Plaintiff,**

v.

**DREXEL FIRESTONE, INC., et al.,
Defendants.**

No. 71 Civ. 5373.

United States District Court,
S. D. New York.

Nov. 27, 1974.

Silverman & Harnes, New York City, for plaintiff.

Sullivan & Cromwell, New York City, for defendants Drexel Firestone, Inc., Drexel Harriman Ripley, Pierson, Heldring & Pierson, Hill Samuel & Co., Ltd., Guinness Mahon & Co., Ltd.

Breed, Abbott & Morgan, New York City, for defendant Arthur Andersen & Co.

Davis, Polk & Wardwell, New York City, for defendant Smith Barney & Co., Inc., Banque Rothschild.

Willkie, Farr & Gallagher, New York City, for defendant J. H. Crang & Co.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Investors Overseas Bank Limited.

Gold, Farrell & Marks, New York City, for defendant Bernard Cornfeld.

Wachtell, Lipton, Rosen & Katz, New York City, for defendant I.O.S., Ltd.

## OPINION

ROBERT L. CARTER, District Judge.

*Posture of the Litigation*

The instant action involves yet another chapter in the fitful recent history of I.O.S., Ltd., the once high-flying mutual fund management corporation. Plaintiff sues on behalf of all who purchased I.O.S. stock from participating underwriters in a September, 1969, tripartite offering, and alleges, in substance, that the prospectuses pursuant to which the offering was made were false and misleading in that they failed to reveal material facts concerning I.O.S.'s finances, illegal activities, chaotic bookkeeping and mismanagement, and the actual looting and plundering of I.O.S.'s treasury, all in violation of Sections 12, 15, and 17 of the Securities Act of 1933 (15 U.S.C. §§ 77l, 77o, and 77q); Sections 10(b), 15(c)(1), and 20 of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78o, and 78t), and SEC Rules 10b–5 and 15cl–2 (17 C.F.R. 240.10b–5, 240.15cl–2).

I.O.S. has been named a defendant, as has Bernard Cornfeld, who during the years with which this litigation is concerned was I.O.S.'s chief executive officer, board chairman, and largest shareholder. Other defendants include the eight principal underwriters and the international accounting firm which certified the financial statements that appeared in the prospectus.[1]

In a memorandum opinion dated June 28, 1972, the court (Frankel, J.) ruled

---

1. Six of the defendant underwriters headed one branch of the offering, and are at times hereafter collectively referred to as the "Drexel Group." They are Drexel Firestone, Inc. (formerly known as Drexel Harriman Ripley; since March 16, 1973, known as Lexerd & Co.; hereafter referred to as Drexel); Banque Rothschild (Rothschild); Hill Samuel & Co., Ltd. (Hill Samuel); Guinness Mahon & Co., Ltd. (Guinness Mahon); Pierson, Heldring & Pierson (Pierson Heldring); and Smith, Barney & Co., Inc. (Smith, Barney). J. H. Crang & Co. (now known as J. H. Holdings, Ltd.; hereinafter referred to as Crang) was lead underwriter for a second branch of the offering, and Investors Overseas Bank, Ltd. (I.O.B.), headed up the third. The accounting firm is Arthur Andersen & Co. (Arthur Andersen).

tentatively that this action might be maintained as a class action. In so doing, Judge Frankel expressly reserved for later determination by the Judge to whom the case was to be assigned for all purposes under the then-incipient individual assignment system, three issues: subject matter and personal jurisdiction; whether foreign purchasers should be included in the plaintiff class; whether and how the court's ultimate judgment may be made binding upon foreign class members. On December 27, 1972, the Drexel Group entered into a consent order (Ryan, J.) with the plaintiff, in which it was agreed that plaintiff would initially limit discovery to the issues left open by Judge Frankel, at the completion of which defendants would make jurisdictional and class determination motions within sixty days.

On April 2, 1973, Judge Ryan ordered that plaintiff's discovery be completed by September 1, 1973. On October 31 and November 1, 1973, defendants other than I.O.S. and Cornfeld filed motions designed to challenge the court's jurisdiction. On December 3, 1973, with the consent of the parties, Judge Ryan adjourned the motions to on or after April 15, 1974. Further adjournments followed.

During the same general period, defendants I.O.S. and Cornfeld were drawn into the fray. On December 7, 1972, a certificate of mailing was filed, indicating that a summons and complaint had been mailed to I.O.S. at an address in London, England. On May 21, 1973, a marshal's return was filed, indicating that Bernard Cornfeld had been served on May 15, 1973, at an address in California. Neither I.O.S. nor Cornfeld appeared, and on September 20, 1973, a default judgment was signed by Judge Ryan and entered against them. On December 5, 1973, defendant Cornfeld moved by order to show cause to vacate the default, and on December 26, 1973, Judge Ryan signed a consent order vacating the default and default judgment, and directing I.O.S. and Cornfeld to serve whatever jurisdictional motions they felt appropriate within forty days, said motions to be returnable at the same time as the aforementioned motions of the other defendants.

On February 1, 1974, a certificate of mailing was filed, indicating that a summons and complaint had been sent to I.O.S. offices in New Brunswick, Canada and Geneva, Switzerland, and to Cornfeld c/o St. Antoine Prison in Geneva, where he was then incarcerated. On February 21, Cornfeld filed a motion to dismiss the complaint and to amend Judge Frankel's class action determination, and on April 18, I.O.S. moved to dismiss the proceedings or, failing that, to stay them.

In mid-June, 1974, my chambers was informed that plaintiff and the Drexel Group were near agreement on a settlement, and that papers embodying the proposed settlement would be placed before the court by the end of June, at which time a conference would be requested. On June 28, 1974, a conference was indeed held. After a spirited exchange between the plaintiff and the "settling defendants" on the one hand and the "non-settling defendants" on the other, a second conference was set for July 15, at which time the relationship between the partial settlement and the pending motions was to be discussed. On the 15th, the parties were apprised of and apparently acquiesced in the court's proposal that it first determine whether subject matter jurisdiction was present, advise the parties orally of its decision so that a notice of settlement could be perfected and distributed, and thereafter the court would file a written opinion explaining its holding.

On July 29, the parties were notified by telephone that the court had concluded that it had subject matter jurisdiction and were given until July 31 to submit technical and procedural modifications to the proposed notice of settlement, and until August 2 to register responses to the suggested changes. On July 30, counsel for Crang requested another conference with the court and the

parties. On July 31, that requested conference was held. The non-settling defendants urged the court to certify to the Court of Appeals, pursuant to 28 U.S.C. § 1292, the subject matter jurisdiction question. Further, they asked a stay of issuance of the notice of settlement until all appeals in respect of the jurisdictional questions had been exhausted. In addition, the non-settling defendants highlighted what they considered to be the most glaring defects in the proposed notice. I advised all present that inasmuch as similar facts and principles would be reviewed and applied in determining questions of subject matter *and* personal jurisdiction, I thought it appropriate to decide these issues together, and then assure appellate review of the package, either by directing the entry of a final judgment under Rule 54(b), Fed.R.Civ.P., or by certifying the jurisdictional questions to the Court of Appeals. I made it clear, however, that determination of the fairness of the settlement and approval or disapproval of same need not and ought not await the outcome of such appeals. I thereupon directed the parties to resolve among themselves as many of the suggested modifications to the proposed settlement as they could, and to submit for my determination the remainder. Moreover, approval of the settlement proposal was *deliberately delayed to make certain* that the time lag between that event and the filing of this opinion on the issues of subject matter and *in personam* jurisdiction would not be of long duration.

### The Issues To Be Considered

Ripe for decision are defendants' motions to dismiss for lack of subject matter jurisdiction, for lack of personal jurisdiction, because of *forum non conveniens*, and (as to defendants I.O.S. and Cornfeld) because of defective service of process and because of plaintiff's failure to prosecute.

### The Nature of the Offering

The 1969 I.O.S. public offering can be viewed as a single offering, two offerings, or three depending upon whether one focuses on the purposes of the offering and the interaction of its prime movers, upon the character of the offerings themselves, or upon the structure of the selling arrangement and the identity and locus of the purchasers. The Drexel Group served as chief underwriters for a primary offering of 5,600,000 new shares sold in Europe to Europeans. I.O.B., a wholly-owned subsidiary of I.O.S., managed a secondary offering in which 490 I.O.S. shareholders, most of them American, sold 3,950,000 shares to I.O.S. employees, long-time clients, and persons with long-standing business relationships with I.O.S., approximately 386 of whom were Americans. Crang managed a secondary offering of 1,450,000 shares, 150,000 of which it received from I.O.B. None of these shares were sold to Americans.

Based upon the evidence before me at the present time, I am convinced that the three offerings were sufficiently integrated and intertwined so as to appropriately be considered a unified transaction for purposes of subject matter jurisdiction considerations. Although the defendants appear to have gone to great pains to refer publicly to the offerings as separate and distinct— and in fact each offering had unique characteristics and some non-identical parties—nonetheless they were closely tied components of a functionally integrated process. Each of the offerings was of common shares of I.O.S. Deposition testimony of key figures involved in the offerings, a memorandum circulated among the various defendants, and the three final prospectuses all confirm that the Drexel Group, I.O.B., and Crang branches of the offering were commenced simultaneously and at the same price of $10 (U.S.) per share. The closings of all of the offerings occurred simultaneously as well. Although three different prospectuses were utilized, those of the Drexel Group and I.O.B. were substantially identical. The Crang prospectus, while "different" from the other two insofar as it sought compli-

ance with Canadian securities regulations, utilized the same certified financial statement prepared by Arthur Andersen & Co., as did the other two prospectuses.

The "Plan of Distribution," at page 29 of the Crang prospectus, describes a patent connection between the I.O.B. and Crang offerings. I.O.B., acting as agent for selling shareholders, most of whom were American, was to offer 4,100,000 shares of I.O.S. common. Of that amount, it agreed to sell 150,000 shares to Crang, which Crang would sell for the American shareholders along with the other shares it was offering. In effect, Crang had assumed the obligations of and rights to a portion of the I.O.B. offering.

Contemporaneous documents also reflect that the underwriters considered the offerings to be closely intertwined, if not unitary. Murray J. Howe, of Crang, described the proposed Canadian offering in an inter-office memo dated August 29, 1969, stating:

> "The *offering of common shares of I.O.S., Ltd.* to the public will total approximately $120,000,000 which will represent 20% of the total number of shares outstanding of the company. This new issue will be offered in Canada, the United Kingdom, Europe and other countries. The portion that will be offered in Canada (all Provinces) for Canadian distribution only, will approximate $15,000,000. . . . The Canadian, United Kingdom and European *offerings will all be coordinated* to be offered on or about September 24th. The issue price which will not be set until 3 or 4 days before the official offering date, will be between $10 and $11 per share which, incidentally, works out to be approximately 15 times current earnings."
> (See Appendix II, accompanying plaintiff's memorandum (hereinafter "Appendix II"—Document 71). (Emphasis added)

In a letter from Howe of Crang to Edward Cowett of I.O.S., discussing the upcoming offering and Crang's role as managing underwriter for Canada, reference was made to the need for someone to coordinate the various underwritings and for one underwriting agreement between I.O.S. and the managing underwriters of each offering. (See Appendix II—Document 73).

As the offering took shape, the managing underwriters appear to have been acutely aware of their ties to each other's segment of the transaction. Grayson Murphy of Shearman & Sterling, the firm representing Drexel Harriman, in a letter to the SEC dated May 14, 1969, requested a meeting with the Commission regarding the offering, seemingly treating it as a unitary one. (Appendix II—Document 75). At the meeting, as described by a member of Drexel Harriman, Murphy explained the principal features of all three of the offerings. (Appendix II—Document 15a). In a letter to the SEC dated August 7, 1969, Murphy referred to the three offerings as separate, yet recognized the connections between the offerings in his attempt to obtain a favorable SEC opinion on registration of the shares. He was necessarily aware of the terms of the two other offerings and their effect upon his branch of the transaction. Moreover, in a reply letter to Murphy of September 8, 1969, the SEC saw fit to communicate information regarding "that part of the offering managed by Investors Overseas Bank."

The so-called "pertinent facts" stressed in Crang's reply memorandum in support of the motion to dismiss are inconclusive. The fact that the managing underwriters did not share in each other's fees might go to their particular roles and responsibilities in the offering, but has little bearing on the integrated nature of the transaction. Additionally, the alleged lack of activity by Crang in the United States and its failure to sell to United States citizens are potentially relevant to the issue of personal jurisdiction, but do little to elucidate the overall character of the offering and the relationship of its three branches.

While plaintiff is necessarily speculating, there appears to be substantial logic in his assertion that the primary and secondary features of the offering were necessary concomitants. The latter, which is an opportunity for management to realize on their investment, provides the incentive for the primary offering. The primary offering managed by Drexel creates the market for management to realize its profit in the secondary offering managed by Crang and I.O.B. While this relatedness of purpose is difficult to document, sufficient ties have been demonstrated to support plaintiff's contention that the three offerings were so integrated as to have their prime movers collectively considered for purposes of subject matter jurisdiction.[2]

*Subject Matter Jurisdiction*

I

Defendants have moved, pursuant to Rule 12(b)(1), F.R.Civ.P., to dismiss for lack of subject matter jurisdiction.

■ The court's jurisdiction emanates primarily from § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.[3] To the extent that some of plaintiff's claims arise under the Securities Act of 1933, its jurisdictional provision —Section 22, 15 U.S.C. § 77v—should be viewed as being coextensive in reach with that of the 1934 Act. This conclusion is dictated by the language of each statute as well as by the statutes' shared function in policing securities transactions that are effected within the United States or that have a significant domestic impact. *Cf.* Leasco Data Processing Corp. v. Maxwell, 468 F.2d 1326, 1335–1336 (2d Cir. 1972); SEC v. United Financial Group, Inc., 474 F.2d 354, 356 (9th Cir. 1973). At issue is whether the reach of those provisions extends to a securities transaction with substantial foreign components.

■■ It is clear that the provisions of the American securities laws may cover transactions in the securities of foreign issuers. *See* Leasco Data Processing Corp. v. Maxwell, *supra*; Madonick v. Denison Mines Ltd., 63 F.R.D. 657 (S.D.N.Y.1974); United States v. Clark, 359 F.Supp. 131 (S.D.N.Y.1973). Ultimately, the concern is that domestic law be applied only to transactions with which the United States has a significant connection or interest. In assessing a particular transaction's connection with the United States, two basic principles are applied, concurrently or alternatively.

The first approach, sometimes referred to as the "subjective territorial principle," extends jurisdiction over acts or omissions which occur within a state's boundaries, even though the effect of such acts or omissions may be felt without. This Circuit, in its most recent pronouncement on application of the securities laws to foreign securities, relied upon this principle as set forth in

2. Supportive of the integrated offering thesis which allows for collective consideration of the defendants, is the aider and abettor concept. Borrowed from the criminal law and the law of torts, it has been applied in private actions under the American securities laws. *See, e. g.,* SEC v. National Bankers Life Insurance Co., 324 F.Supp. 189 (N.D. Tex.1971); Pettit v. American Stock Exchange, 217 F.Supp. 21 (S.D.N.Y.1963).

3. That provision reads, in pertinent part:
   *"Jurisdiction of offenses and suits.*
   The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. . . ."

§ 17 of the Restatement (Second) of Foreign Relations Law of the United States (1965).[4] Leasco Data Processing Corp. v. Maxwell, *supra*.

In *Leasco*, an American company sought damages resulting from the fraudulent sale of a British company, the stock of which was listed on the London Stock Exchange, but not on any American exchange. The actual purchase of the securities occurred in England. The court focused on misrepresentations and meetings which occurred in the United States, although it acknowledged that the crucial misrepresentations may have occurred in England. It stated, 468 F.2d at 1334:

> "Conduct within the territory alone would seem sufficient from the standpoint of *jurisdiction* to prescribe a rule. It follows that when, as here, there has been significant conduct within the territory, a statute cannot properly be held inapplicable simply on the ground that, absent the clearest language, Congress will not be assumed to have meant to go beyond the limits recognized by foreign relations law."

The second approach, which has been labeled the "objective territorial principle," was implicitly applied in Schoenbaum v. Firstbrook, 405 F.2d 200 (2d Cir. 1968). The principle, as set forth and illustrated in § 18 of the Restatement (Second) of Foreign Relations Law of the United States (1965),[5] extends jurisdiction to conduct which occurs outside a territory, but which has an impact within the territory.[6]

In *Schoenbaum*, American shareholders brought an action against a Canadian company which did no business in the United States for fraudulent acts committed outside the United States with respect to the securities of that foreign company. The court found jurisdiction because the securities were registered on an American exchange and the transactions in question were seen as being detrimental to the interests of American investors. It cited two examples of transactions possessing foreign elements but having a domestic impact.[7]

---

4. "§ 17. Jurisdiction to Prescribe with Respect to Conduct, Thing, Status, or Other Interest within Territory

A state has jurisdiction to prescribe a rule of law

(a) attaching legal consequences to conduct that occurs within its territory, whether or not such consequences are determined by the effects of the conduct outside the territory, and

(b) relating to a thing located, or a status or other interest localized, in its territory."

5. § 18. Jurisdiction to Prescribe with Respect to Effect within Territory

A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either

(a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or

(b) (i) the conduct and its effect are constituent elements of activity to which the rule applies;

(ii) the effect within the territory is substantial;

(iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and

(iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems."

6. An early application of this principle by this Circuit occurred in the well-known antitrust case of United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945), where it was held that:

"... it is settled law ... that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends; and these liabilities other states will ordinarily recognize. ..."

7. These two examples do not comprise an exhaustive list of transactions to which the objective territorial principle applies. *See* Travis v. Anthes Imperial Ltd., 473 F.2d 515, 523, n. 14 (8th Cir. 1973):

"We are not persuaded that the Second Circuit intended, in *Schoenbaum*, to set forth the exclusive circumstances in which extraterritorial application of the Act is proper. ... The court was not required to decide whether the Act would apply to a foreign transaction in foreign securities which had never been registered or listed on an American exchange when a number of signif-

"We believe that Congress intended the Exchange Act to have extraterritorial application in order to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market ·from the effects of improper foreign transactions in American securities."

Schoenbaum v. Firstbrook, *supra,* 405 F.2d at 206.

## II

Application of the principles espoused in *Leasco* and *Schoenbaum* satisfies the court, as more fully explained below, that subject matter jurisdiction exists.[8]

The record indicates that conduct took place in the United States continually throughout the entire period during which the offering was conceived, assembled and effected. The offering was discussed and at least partially initiated and organized here during numerous meetings between the major underwriters, their American attorneys, I.O.S. officials and accountants. In March and April of 1969, an I.O.S. official met with a representative of Guinness Mahon Representation Co. of N.Y. (which was affiliated with Guinness Mahon & Co. Ltd. of London), and an officer of Drexel at Drexel's New York offices on two occasions, during which the proposed offering was discussed. (*See* Appendix II —Documents 1 and 2).

After Drexel retained the New York law firm of Shearman & Sterling to represent it in the offering, members of that firm engaged in numerous meetings and interactions in and from the United States while shaping Drexel's participation and putting the offering together. Murphy, of Shearman & Sterling, met with Edward Cowett, an executive officer of I.O.S., and two representatives of Drexel in New York in order to discuss, *inter alia,* the listing of the shares, locations of the offering, and tax problems of I.O.S. officials. Murphy engaged in several telephone conversations from New York with Cowett in Geneva. (*See* Appendix II—Document 6). Drexel officials and its counsel met with SEC officials to discuss the offering and problems the SEC had with I.O.S. (*See* Appendix II—Document 8). Other communication with the SEC followed and Murphy was put on warning as to potential application of a 1967 SEC prohibitory order to I.O.B. sales to Americans. (Appendix II—Document 44).

Drexel retained the services of Price Waterhouse in New York to act as a financial consultant in the offering and to help investigate I.O.S. These efforts

---

icant elements of the fraudulent scheme took place in the United States.

"Moreover, *Schoenbaum* was not a limiting *decision as the Court decided that subject* matter jurisdiction was present."

8. Plaintiff has relied upon a third theory of jurisdiction which this court need not explore in depth. Termed the "nationality principle," *it carries less weight than the* two approaches already described, and provides a territory with jurisdiction over the conduct, wherever effectuated, of its nationals. It provides, as embodied in § 30 of the Restatement (Second) of United States Foreign Relations Law, that:

"§ 30. Jurisdiction to Prescribe with Respect to Nationals

(1) A state has jurisdiction to prescribe a rule of law

(a) attaching legal consequences to conduct of a national of the state wherever the conduct occurs or

(b) as to the status of a national or as to an interest of a national, wherever the thing or other subject-matter to which the interest relates is located."

The American nationality and character of defendants was stressed in SEC v. United Financial Group, Inc., *supra.*

This theory of jurisdiction is relevant insofar as Drexel Harriman and Smith, Barney, the two leading underwriters of the primary offering, were American firms. In addition, Price Waterhouse was retained by Drexel Harriman as a consultant and to aid in the due diligence report. Finally, several New York law firms were involved in the preparation of the prospectus and the offering. Although I.O.S. was a foreign-based corporation, its president, Bernard Cornfeld, its chief operating officers, and many of its employees were Americans.

were part of the due diligence report. (Appendix II—Documents 11 and 13). Numerous planning and exploratory communications took place in New York, involving the underwriters, attorneys and Price Waterhouse. (Appendix II—Documents 15–20, 23). A review of some of the Arthur Andersen work papers involved in its earlier financial report on I.O.S. was made by Price Waterhouse officials in New York. While the bulk of those papers related to mutual funds owned by I.O.S., the information was relevant to preparation of the prospectus. (Appendix II—Document 20).

Negotiations and meetings between the principal parties continued through July and August of 1969 in New York and elsewhere. Although much of the work performed at that time was preliminary research undertaken by Drexel prior to firmly committing itself, substantial elements of the offering were structured as a result of this activity. (*See generally* Appendix II—Documents 22–42). For example, at a meeting in which Cowett of I.O.S. and Coleman of Drexel expressed their intention to enter a firm agreement, terms of the offering were discussed—mainly prices and accounting procedures. Preliminary discussions on underwriting discounts and commissions possibly took place in New York. (Appendix II—Document 26). Financial information on I.O.S. and the various mutual funds it advised was sent to Price Waterhouse in New York and was kept on file there. (Appendix II—Document 28).

At a meeting in New York on July 11, 1969, members of Price Waterhouse, Arthur Andersen, Shearman & Sterling, I.O.S., and Drexel discussed the need for an audit or partial audit in connection with the offering planned for September. A timetable for the audit and the need for an early offering were discussed. Additionally, Arthur Andersen's work in connection with June 30, 1969, financials of I.O.S. was mentioned. (Appendix II—Documents 30, 32). Counsel for Drexel met with I.O.S. counsel in New York and discussed a draft of the opinion letter to be issued in connection with the offering. (Appendix II—Document 33).

After returning from work in Europe, Price Waterhouse officials met with members of Shearman & Sterling and Drexel in New York. They discussed a preliminary draft of a report by Price Waterhouse to Drexel that included questions about practices engaged in by I.O.S., and Arthur Andersen's financial report on the company. Work on that report was performed in Europe and New York. Price Waterhouse also reviewed property in Florida held by one of the funds managed by a subsidiary of I.O.S. (Appendix II—Documents 45 and 47).

On September 23, 1969, the day before the offering was to commence, an SEC investigation of a subsidiary of I.O.S. was reported in the press. Coleman of Drexel, Murphy of Shearman & Sterling, and Stammer of the law firm of Haft & Stammer met in New York and drafted a sticker to be attached to the prospectus regarding the SEC investigation. Calls were made to I.O.S. officials in Geneva and a joint decision was made on the addition to the prospectus. (Appendix II—Document 50). Letters were sent by Murphy in New York to various participants in the offering, distributing a proof of the Closing Memorandum. (Appendix II—Document 52).

Drexel established bank accounts with the Bank of New York for the I.O.S. offering, and instructed those purchasing I.O.S. shares that payment was to be made in United States dollars to the Bank of New York on Broad Street, for the account of Drexel with the Bank of New York in London. (Appendix II—Documents 56–58). Meetings were held in New York and reports submitted on the progress of the offering. (Appendix II—Documents 63 and 64). A memorandum describing the procedure for the offering was prepared and distributed in New York. (Appendix II—Document 70).

During this period other underwriters had been contacted and were involved in the offering plan. In April of 1969, while in New York, Murray J. Howe, president of Crang, met with Cowett of I.O.S. While there is no indication that the meeting was pre-planned, the I.O.S. offering was discussed and Crang made an effort to secure the entire Canadian underwriting. (Appendix II—Documents 4 and 27). Howe's letter dated May 13, 1969, makes clear that details of the offering were discussed at the New York meeting. As demonstrated by the opening line of that letter—"When we last met in New York to discuss the forthcoming issue of I.O.S., Ltd. (S.A.) . . ."—the I.O.S. offering was not a peripheral topic of conversation, and was at least a primary reason for the meeting. (Appendix II—Document 73). A second meeting in New York occurred in July, 1969, at which the I.O.S. prospectus and offering were discussed. (Appendix III—Document 27).

Executives of Smith, Barney, another leading underwriter, met in New York, discussed the offering and decided to participate. (Appendix II—Document 12). They engaged in talks with Drexel in New York regarding the offering, and structured their own involvement in the offering. (Appendix II—Documents 36, 37, 39, 40, 42). Smith, Barney determined that all of its I.O.S. share allocations would be made through its New York office (Appendix II—Document 49), and that payment for the shares was to be made to a bank in New York, payable to a subaccount in London. (Appendix II—Document 51).

In August and September of 1969, other prospective American underwriting firms were solicited. Those firms which did not have European offices were shown a draft of the prospectus which was brought from Europe and taken around by hand in New York. (Appendix II—Document 43).

██ Obviously, many of the documented occurrences, taken by themselves, are of minimal significance.

Nonetheless, these circumstances viewed *in toto* disclose conduct constituting an essential link in the offering in the United States. While formal or ultimate acts were staged in Europe—e.g., the drafting of the final prospectus and signing of agreements—discussions, investigations, decision-making and planning were carried on, to a significant extent in the United States by Americans and others, and the acts abroad were substantially supervised from New York. Instrumentalities of interstate commerce were commonly used. Much of the effort that went into the due diligence report and preparation of the material basic to all the prospectuses also appears to have been expended in the United States.

### III

Defendants place great emphasis upon the fact that fraudulent misrepresentations were not made or relied upon in the United States, thus distinguishing the transaction in question from the rule of *Leasco*, as they understand it. Their understanding is somewhat myopic insofar as they treat synonymously the limited fact pattern in *Leasco* with the broader and more flexible legal principles which the court applied.

The crux of the jurisdictional basis in *Leasco* was the finding of "significant conduct within the territory." Leasco Data Processing Corp. v. Maxwell, *supra*, 468 F.2d at 1334. *See also* Travis v. Anthes Imperial, Ltd., 473 F.2d 515, 524 (8th Cir. 1973); SEC v. United Financial Group, Inc., *supra*. To be sure, in the instant case the ultimate representations or inducements do not appear to have occurred in the United States, as was true in *Leasco*; nevertheless, as just enumerated, other significant conduct clearly did occur here which influenced and shaped the entire underwriting and offering, including the extent and quality of disclosure. It would seem consistent with the *Leasco* approach to consider that conduct as jurisdictionally significant. As in *Leasco*, the mails and other instruments of interstate com-

merce were a necessary part of the domestic activity. Finally, the domestic conduct was, although less direct than that in *Leasco*, an "essential link" in inducing the ultimate purchases.

A second element integral to the finding of jurisdiction here is the impact which the transaction in question had upon American investors and the American securities market. The defendants acknowledge that the *Leasco* court considered significant the fact that an American company was defrauded. Fradulent sale to Americans was also given weight by this court in United States v. Clark, 359 F.Supp. 131 (S.D. N.Y.1973), and by the Ninth Circuit in SEC v. United Financial Group, Inc., *supra*. It is recognized that the defendants appear to have made an attempt to prevent any sales to Americans. Moreover, no sales to Americans did occur through the Drexel Group or Crang offerings. Nevertheless, as previously discussed, the three offerings should be considered a single transaction for purposes of subject matter jurisdiction. Sales through the I.O.B. offering have been documented to approximately 386 Americans, one among them being plaintiff Bersch. While this might ultimately prove to be a small number of the class sought to be represented, the number is not determinative.[9]

Plaintiff suggests another impact on the American securities market resulting from the offering. Plaintiff contends that I.O.S. was so deeply intertwined with the American securities market that its activities were an appropriate concern of the SEC and the courts under the mandate of our securities laws. I.O.S.'s principal business activity at the time of the offering was the sale and management of mutual funds. Those funds conducted a massive amount of trading in American securities, giving them a significant potential to create severe market instability. As documented by Professor Morris Mendelson in a study of I.O.S., the findings of which are outlined in an affidavit submitted to the court, the failure of the I.O.S. offering had the effect of impairing foreign investor confidence in the American market and inhibiting sales of domestic securities abroad with a subsequent decrease in the flow of foreign capital; moreover, the mutual funds sold large amounts of American securities resulting in a depression in the prices of American securities. While proof of a clear correlation between the failure of the I.O.S. offering and the above-mentioned results is difficult to document, some credence must be given to the general proposition that a collapse of a public offering by a company whose subsidiaries trade and hold massive amounts of American securities would have a negative impact on the American market.

*The Section 30(b) Exemption*

Several of the defendants—Crang and Smith, Barney—assert that they are exempt from the coverage of the Securities Exchange Act by reason of Section 30(b) of that Act, 15 U.S.C. § 78dd(b). That section provides:

"The provisions of this chapter or of any rule or regulation thereunder *shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States,* unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this chapter." (Emphasis added)

9. In SEC v. United Financial Group, Inc., *supra*, only three American investors were ascertained. The court perceived a sufficient impact on American investors, holding, 474 F.2d at 356–57:
"In this case, focus should be upon appellants' activities within the United States and the impact of those activities upon American investors. Here, there was a showing of very substantial activities by appellants within the United States and a showing that, as a result of those activities, at least three American investors now hold nearly $10,000 worth of stock for which there appears to be no market  .  .  .  ."

The above-named defendants contend, in essence, that they transact a business in securities abroad.

■ In invoking § 30(b), defendants have interpreted that provision literally, contrary to the prevailing view in this Circuit. Initially, it should be noted that in Schoenbaum v. Firstbrook, *supra*, it was held that § 30(b) does not exempt those who engage in isolated foreign transactions. More significantly, the court explicitly held that "jurisdiction" as employed in § 30(b) is not defined as "territorial limits." *Accord*, SEC v. United Financial Group, Inc., *supra*. If essential elements of the transaction in question occurred here, and/or there was a significant impact on the domestic market, then the transaction is deemed to have occurred within the jurisdiction of the United States and § 30(b) does not apply. *See, e.g.*, Roth v. Fund of Funds, Ltd., 405 F.2d 421 (2d Cir. 1968), cert. denied, 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969), rehearing denied, 395 U.S. 941, 89 S.Ct. 1994, 23 L.Ed.2d 459 (1969); In the Matter of I.O.S., Ltd. (S.A.), CCH Fed. Sec.L.Rep. ¶ 78,637 (March 14, 1972).

Nor does Kook v. Crang, 182 F.Supp. 388 (S.D.N.Y.1960), buttress defendants' argument. As the SEC noted in its ruling in In the Matter of I.O.S., Ltd. (S.A.), *supra*, at 81,361:

"Kook v. Crang, . . . makes clear that a Section 30(b) exemption depends upon a showing that all the essentials of the transactions in question occurred outside of the United States."

■ Here, concededly, certain essentials of the transaction did occur within the United States. That transaction involved the three intertwined offerings and therefore Crang and Smith, Barney are all implicated in the jurisdictionally significant conduct which occurred domestically. Thus, each can be said to have transacted a business in securities *within* the jurisdiction of the United States, removing them from the protection of § 30(b).

*In Personam Jurisdiction*

Two of the defendants—Crang and I. O.S.— [10] move for dismissal pursuant to Rule 12(b)(2), Fed.R.Civ.P., contending that this court lacks *in personam* jurisdiction as regards them. Their argument, as individually applied, is that they neither "do business" in the United States, nor committed acts here out of which the cause of action arose, nor engaged in conduct outside the United States which had significant, foreseeable effects within the United States.

While the principles applied in determining personal jurisdiction resemble in many respects those relevant to consideration of subject matter jurisdiction, they are not identical or co-extensive. Each is directed to the protection of different interests. In considering subject matter jurisdiction, it was the transaction that was the point of focus and therefore the defendants could be viewed collectively as they were tied to the transaction. Personal jurisdiction, as the phrase itself connotes, requires that each party's connection with the forum be individually assessed.

■ The jurisdictional sections of the securities laws (Section 22(a) of the Securities Act and Section 27 of the Exchange Act) have been interpreted as extending their reach as far as the due process clause of the Fifth Amendment will allow. As was held in Leasco Data Processing Corp. v. Maxwell, *supra*, 468 F.2d at 1340:

". . . it is reasonable to infer that Congress meant to assert personal jurisdiction over foreigners not present in the United States to but, of

---

10. The lack of *in personam* jurisdiction was also raised by the defendants who are parties to the proposed settlement as approved by the court. Since the issue of personal jurisdiction, in contrast to subject matter jurisdiction which was determined before the court approved the proposed settlement, was decided after the settlement was approved, that issue was not considered as to those who are parties to the proposed settlement.

course, not beyond the bounds permitted by the due process clause of the Fifth Amendment. . . ."

■ It is apparent that neither of these defendants was "present" or "doing business" in the United States in the traditional sense, so as to establish personal jurisdiction. *See* Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Crang was a Canadian brokerage house with no office, bank accounts, telephone listings, subsidiaries or affiliates in the United States. Nor did it have salesmen in the United States. I.O.S., at the time of the transaction in question, was a Canadian corporation with its principal place of business in Geneva, Switzerland. It did not maintain offices in the United States and was, in fact, restricted from engaging in securities transactions in the United States.[11] Neither of these corporations can be said to have engaged in systematic and continuous activity within the United States, invoking the benefits and protections of its laws. Hanson v. Denckla, *supra*. *See also* Restatement (Second) Conflict of Laws, § 47.

Nevertheless, though not present or doing business in the United States, parties may come within the personal jurisdiction of this court. *See* Restatement (Second) Conflict of Laws, §§ 49 and 50. The Court in *Leasco* stated, 468 F.2d at 1340:

"... where a defendant has acted within a state or sufficiently caused consequences there, he may fairly be subjected to its judicial jurisdiction even though he cannot be served with process in the state . . . ."

Even under the lesser standard of committing acts within the forum rather than engaging in systematic activity, Crang cannot be deemed to have satisfied *in personam* jurisdictional threshold requisites. The only acts of Crang within the United States related to the transaction in question appear to have been the breakfast meetings between Howe and Cowett. These *de minimis* preliminary discussions can hardly be considered acts out of which the cause of action arose. *Cf. International Shoe, supra.* There has been no showing that they were related to the alleged misleading statements and omissions in the prospectuses. Moreover, plaintiff's purchase of I.O.S. shares does not appear to have been made in reliance on statements in the Crang prospectus, since that prospectus was sent to the United States after the date of the purchase. The evidence reveals that Crang investigated I.O.S.'s affairs and prepared the prospectus in Canada, Switzerland and France. It accepted orders for I.O.S. stock in Toronto and sold shares only outside the United States and only to non-Americans.

■ As to I.O.S., the conclusion is different. The facts detailed earlier reveal that top I.O.S. officials were in the United States repeatedly during the planning of the offering, conferring with the lead underwriters and attorneys. Their meetings were directly related to the offerings, and information was discussed which later was incorporated into the prospectuses.

■ The second half of the jurisdictional test articulated by this Circuit in *Leasco*, namely—whether acts outside the United States sufficiently caused consequences here—remains to be applied to Crang. As defined by the Court, 468 F.2d at 1341:

"But this is a principle that must be applied with caution, particularly in an international context. . . . At minimum the conduct must meet the tests laid down in § 18 of the Restatement (Second) of Foreign Relations Law, including the important re-

---

11. The question of whether I.O.S. could be considered to have been doing business in the United States by virtue of its subsidiaries or other entities, need not be reached in light of the disposition to follow.

quirement that the effect 'occurs as a direct and foreseeable result of the conduct outside the territory.' We believe, moreover, that attaining the rather low floor of foreseeability necessary to support a finding of tort liability is not enough to support *in personam* jurisdiction. The person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him."

The conduct abroad of the individual party must have a substantial, direct, and foreseeable result in the United States.

In finding subject matter jurisdiction, it was significant that several hundred Americans purchased I.O.S. stock pursuant to the I.O.S. prospectus. Here, where Crang did not sell I.O.S. shares to any American citizen, took precautions to prevent and placed restrictions on the sales to Americans, and understood that all other parties to the offering would observe similar restrictions, it would be difficult to conclude that its conduct was designed to have an effect within the United States. Moreover, as noted in the section on subject matter jurisdiction, *supra,* the impact on the American securities market of the I.O.S. offering was in fact less than direct. The absence of clearly provable or probable negative domestic impact is close to fatal in the context of personal jurisdiction where impact *per se* is not the gravamen; rather the issue is whether there has been impact *which a party had good reason to foresee.* Applying this more stringent standard, I cannot reasonably conclude that the conduct of Crang abroad justifies or permits the exercise by this court of personal jurisdiction over it.[12]

Plaintiff's remaining theory of jurisdiction, i.e., that individual defendants served as aiders and abettors, does not help create personal jurisdiction over Crang. As already indicated, Crang committed no acts within the United States which substantially fostered or made possible the allegedly fraudulent transaction. Moreover, acts within the United States of some conspirators do not confer jurisdiction over foreign coconspirators. As held in Leasco Data Processing Corp. v. Maxwell, *supra,* 468 F.2d at 1343, "The rule in this circuit is that the mere presence of one conspirator . . . does not confer personal jurisdiction over another alleged conspirator." *See also* H. L. Moore Drug Exchange, Inc. v. Smith, Kline & French Laboratories, 384 F.2d 97, 98 (2d Cir. 1967) ; Bertha Building Corp. v. National Theatres Corp., 248 F.2d 833, 836 (2d Cir. 1957), cert. denied, 356 U.S. 936, 78 S.Ct. 777, 2 L.Ed. 2d 811 (1958).

In conclusion, personal jurisdiction exists as to I.O.S., but is lacking as to Crang.

*Remaining Contentions*

Defendants Cornfeld and I.O.S. add a third string to their jurisdictional bow. They correctly observe that no matter how closely tied they or the 1969 offering are to the United States, this court may not exercise jurisdiction over them unless proper service of process has been made upon them. Section 22(a) of the Securities Act of 1933 (15 U.S.C., (§ 77v(a)) and § 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) expressly authorize extra-territorial service in any district "of which the defendant is an inhabitant or wherever the defendant may be found." However, they do not prescribe the *manner* in

12. While jurisdiction over I.O.S. does rest on its acts within the United States, it is likely that such jurisdiction could be buttressed under the "effects" test. I.O.S., as the central figure in the transaction, had the most direct relationship to the information in the prospectus as well as the mechanics of the offering. It was also well aware of its ties to the United States securities market. Fraudulent sales to Americans, as well as the impact on the domestic market, were or should have been foreseeable results of its activities abroad.

which service must be effected. Rule 4(i)(1)(D), F.R.Civ.P., is designed to fill such statutory gaps and provides for service "by any form of mail, requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served."

I.O.S. contends that it was not "found" at either of the addresses where service was attempted. Plaintiff first sought to serve I.O.S. in 1972 by dispatching to I.O.S. at "99 Aldwych, London, W.C.2, England" a copy of the summons and complaint, return receipt requested. The envelope containing the summons and complaint was returned to sender, and bore the handwritten word "Refused" and a series of markings which appear to be initials. In December of 1973, plaintiff consented to the vacation of a default judgment entered against I.O.S. three months earlier, without conceding that the original service of process had been invalid. Nevertheless, in February, 1974, plaintiff again attempted to serve I.O.S. by registered mail, this time dispatching a summons and complaint to 147 Rue de Lausanne, Geneva, Switzerland, and to 22 King Street, St. John, New Brunswick, Canada.

I.O.S. attacks the original service principally on the ground that I.O.S. did not at any time herein relevant maintain an office or otherwise transact business at the London address and accordingly could not be "found" there. Although plaintiff has at various times vouched (with decreasing ardor) for the process by which he obtained an address where I.O.S. could be served, and has urged this court to infer from the fact that *someone* in London refused service that it was I.O.S. who refused service, plaintiff does not directly dispute that the London address was not I.O.S. territory.

■ The subsequent attempts at service are, however, less vulnerable to attack. I.O.S. concedes that the Geneva address was for years the site of its principal executive offices, but argues that in February, 1974, it could no longer be "found" there since five months earlier liquidation proceedings had been commenced in Canada, the country where it was headquartered and domiciled. To the extent that I.O.S. insists it could only be "found" at the place of business of its co-liquidators, it suggests too restrictive a standard of where a corporation may be found. *Cf.*, United States v. Scophony Corp., 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948). *See also,* Wash.Virginia Ry. v. Real Estate Trust, 238 U.S. 185, 35 S.Ct. 818, 59 L. Ed. 1262 (1914). To the extent that I. O.S. relies on its own representation that none of its employees remained at the Geneva address in February, 1974, a fact issue is raised. However, that question need not be resolved because the attempted service in New Brunswick, Canada, substantially satisfies the statute. Indeed, I.O.S. does not deny that the New Brunswick address was the "head office" of the company. Rather, it points to the fact that the complaint and summons sent to New Brunswick were returned to sender as proof that I.O.S. was not found at that address. But such a literal construction of "found" would mean that a defendant could avoid service of process merely by returning the summons.

■ I.O.S. further argues that even if it was "found" at one of the three addresses, none of the attempted services conformed to the procedural requirements of Rule 4(i)(2) which provides:

"When service is made pursuant to [Rule 4(i)(1)(D)], proof of service shall include a receipt signed by the addressee or other evidence of delivery to the addressee satisfactory to the court."

Since the summons sent to New Brunswick was not accepted, it would be unreasonable to require as proof of service a receipt signed by the addressee, and proof of service must be sought elsewhere. Upon examination of the postmarks and other official markings which

appear on the returned envelope (Exhibit C of plaintiff's memorandum in opposition to the motion), the court is convinced that delivery was in fact made to the New Brunswick address. Finally, I. O.S. insists that service was defective because the return receipt required by Rule 4(i)(1)(D) was returnable to plaintiff's counsel rather than to the clerk of the court. However, the Rule only requires that the clerk attend to the mailing out of the notice. Here, the clerk did so, in response to a letter from plaintiff's counsel dated January 21, 1974.

Defendant Cornfeld's objection to service of process is more readily disposed of. He objects to the service in May, 1973, of a summons and complaint upon Ms. Diethild Gainer at a residence in Beverly Hills, California. However, the court need not speculate as to the relationship between Mr. Cornfeld and Ms. Gainer, or between either of them and the California abode, because in February, 1974, service was made pursuant to Rule 4(i)(1)(D) on defendant Cornfeld in St. Antoine Prison where he was indisputably "found."

██ Defendant I.O.S.'s final service of process argument is that the due process requirement set forth in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)—that "notice [must be] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"—is not here satisfied. However, the fact that defendant moved in 1973 to overturn the default entered against it manifests an awareness of the pendency of the action, and Judge Ryan's order of December 5, 1973, vacating that default provided defendant a fair opportunity to present its objections. Thus, by the time a technically correct service of process was effected in February, 1974, I.O.S. had actual notice of the proceeding and was an active participant therein. Under all the circumstances, due process was satisfied.

Having thus determined that both subject matter and personal jurisdiction lie, the court must decide whether it should in the exercise of its discretion decline to exercise its jurisdiction. The motions made by certain of the defendants for dismissal on grounds of comity or *forum non conveniens,* and I.O.S.'s motion for a stay of proceedings are not well taken. However, more troubling are the motions made by defendants I. O.S. and Cornfeld to dismiss for failure to prosecute.

██ Plaintiff has not deigned to explain to the court why a year passed between its filing of the complaint and its first attempt to serve the moving defendants. Plaintiff's contention that it delayed issuing summonses until it obtained a full description of I.O.S.'s and Cornfeld's contacts with the United States rings hollow when played against the background of early service on defendants like Crang and Banque Rothschild. A more ingenuous explanation might have enabled the court to determine whether plaintiff's lack of diligence in prosecuting this action as against the movants was excusable. However, the particular circumstances of this case lead me to conclude that plaintiff's lack of diligence was, irrespective of the reasons for it, moderate rather than grave. Unlike the plaintiff in Link v. Wabash R. Co., 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962), the plaintiff here has not blocked or retarded the orderly and expeditious disposition of its own case. Although this action has in general proceeded at a reasonable pace, it is still at an early stage of development. Threshold questions of jurisdiction are just now being decided, and defendants I.O.S. and Cornfeld were brought into the case soon enough to play a substantial role in focussing the jurisdiction inquiry.

Even though plaintiff's delay in serving the movants may be characterized as "moderate neglect," the question remains whether defendants were prejudiced by the delay. Messenger v. United States, 231 F.2d 328 (2d Cir. 1956). In-

deed, in every case where an alleged failure to prosecute arises out of a delay in serving one defendant even though other defendants have been served and diligently proceeded against, it would seem analytically sounder to assess the prejudice *vel non* suffered by the odd-defendant-out rather than to assess the degree of the plaintiff's "neglect" as to that defendant. Here, I am reasonably convinced that any "prejudice" suffered by defendants I.O.S. and Cornfeld has resulted from the passage of time rather than from the service delay. Even had I.O.S. been served the same day the action was commenced, its ability to defend itself would have been affected by changes in personnel and control. There is no reason to believe that had these two defendants been served sooner this complex multiparty litigation would have proceeded more quickly or fairly. Up to this point, discovery has been limited to jurisdictional questions; and the movants have had ample opportunity (and taken advantage of same) to test out the court's jurisdiction. Accordingly, the motions to dismiss for failure to prosecute are denied.

## CONCLUSION

The motions of all defendants to dismiss for lack of subject matter jurisdiction are denied. The motion of Crang to dismiss for lack of personal jurisdiction is granted, and the motion of I.O. S. to dismiss, for lack of personal jurisdiction is denied. The motions by I.O. S. and Cornfeld to dismiss because of defective service of process are denied, as are their motions alleging a failure to prosecute. The motions seeking dismissal on grounds of comity and *forum non conveniens* are denied as is I.O.S.'s motion for a stay of proceedings.

So ordered.

## ON REQUEST FOR CERTIFICATION

The defendants have asked that the court's determination that it has subject matter jurisdiction and *in personam* jurisdiction over I.O.S. and Cornfeld

filed this day be certified for appeal to the United States Court of Appeals pursuant to 28 U.S.C. § 1292(b). The issue of subject matter jurisdiction clearly meets the statutory criteria. While the jurisdictional reach of our securities laws has been settled and clarified by our Court of Appeals in Schoenbaum v. Firstbrook, 405 F.2d 200 (2d Cir. 1968), and Leasco Data Processing Corp. v. Maxwell, 468 F.2d 1326 (2d Cir. 1972), there is substantial ground for difference of opinion as to whether the *ratio decidendi* of those cases was properly applied in the instant case. Moreover, the question of subject matter jurisdiction is a controlling issue of law in this case. If the court is in error, the whole controversy could be terminated. The basis for the court's determination was that the tripartite offerings involved were an integrated entity and not three distinct, separate and independent transactions. An immediate appeal, if the court is in error, will materially advance the ultimate determination of the controversy and "would save * * * the cost and delay of protracted and expensive litigation." Bobolakis v. Campania Panamena Maritima San Gerassimo, 168 F.Supp. 236, 240 (S.D.N.Y. 1958). Therefore, the request that the determination in respect of subject matter jurisdiction be certified for appeal pursuant to 28 U.S.C. § 1292(b) is granted.

The determination that *in personam* jurisdiction is lacking as to defendant Crang is made final and entry of final judgment is ordered entered pursuant to Rule 54(b), F.R.Civ.P.

However, I do not regard the conclusion that *in personam* jurisdiction exists in respect of I.O.S. and Cornfeld as meeting the requisites for certification. The standards for holding I.O.S. and Cornfeld personally subject to the court's jurisdiction are too well established and firmly fixed for there to be much room for difference of opinion as to the conclusion reached by the court that personal jurisdiction over

these defendants exists. The cases cited and relied on in the personal jurisdiction section of the opinion leave little basis for a contrary conclusion. Accordingly, the question is not certified for appeal.